**LUBBOCK MANUFACTURING COMPANY, Appellant,**

v.

**Francisco Pena PEREZ, Jr., et al., Appellees.**

**No. 5965.**

Court of Civil Appeals of Texas, Waco.

Oct. 18, 1979.

Rehearing Denied Nov. 29, 1979.

Damon Ball and Thomas H. Crofts, Jr., Groce, Locke & Hebdon, San Antonio, Thomas M. Reavley, Austin, for appellant.

H. David Peeples, Bruce Miller and Franklin D. Houser, Tinsman & Houser, Inc., Warren Weir, Gochman & Weir, Loyd E. Bingham, Jr., Brock, Bingham & Persons, San Antonio, Jerald Abrams, Knickerbocker, Abrams & Cowan, Inc., Eagle Pass, J. Patrick Hazel and Broadus A. Spivey, Spivey & Grigg, Austin, for appellees.

OPINION

JAMES, Justice.

This is a suit for personal injuries and wrongful death, involving "strict liability" as well as "negligence" grounds of recovery. In the trial court 32 suits were brought against Appellant Lubbock Manufacturing Co. and others, all of which were consolidat-

ed and tried as one lawsuit. The claims arose from an explosion and fire which resulted from the overturning of a liquefied petroleum gas (LPG) transport vehicle in Maverick County, Texas.

Appellant Lubbock Manufacturing Co. designed and manufactured the tank-trailer portion of the vehicle, and sold same in the year 1965.

On April 29, 1975, at or about 4:15 P.M., Jesus Verduzco was driving a tractor-trailer westbound in the right lane of U.S. Highway 277 entering the city of Eagle Pass, Texas. He was acting in the course and scope of his employment by and for Surtigas, S.A., a Mexican Corporation, the owner of the tractor-trailer at the time of the accident. The tractor was equipped with a "fifth wheel" manufactured by Fontaine Truck Equipment Co., a division of Altamil Corporation.

The trailer was designed, manufactured, and assembled by Appellant Lubbock Manufacturing Co. Lubbock sold the trailer in September 1965 to one Uranga who in turn soon thereafter sold it to Surtigas. Said trailer was designed and manufactured for the transport of liquefied petroleum gas (butane and/or propane), with a water capacity of 10,000 gallons. The tank was its own chassis. The tank-trailer had been filled to 90% capacity (9,000 gallons of LPG) in Big Wells, Texas, and Verduzco was transporting the load to the Surtigas plant in Mexico by way of Eagle Pass, Texas. As Verduzco was proceeding west on Highway 277 in the outskirts of Eagle Pass, a white or light-colored car (which was never located after the accident) either turned to enter an auto repair garage or else came out of the area in front of the garage onto the highway. At any rate the white car loomed up suddenly and unexpectedly in front of Verduzco and in his lane of traffic; whereupon, Verduzco turned the tractor to his left and applied his brakes, and then, almost immediately after at least the tractor was in the eastbound lane of this two-lane highway, Verduzco turned back to his right to avoid oncoming traffic, which brought about the overturn of the tank-trailer.

There was conflicting testimony as to whether the tractor also overturned. It is undisputed that the "fifth wheel" broke. The fifth wheel is the device by which the tank-trailer is connected up with the tractor.

The tank-trailer turned over onto its left side and then rolled and skidded off the highway for a distance of some 108 feet, at which point said tank-trailer struck a corner of a one foot thick steel reinforced concrete wall, which stood about 27 inches above ground level. This was the headwall of an irrigation canal which ran in a general north-south direction and which canal ran under the highway. The force of the impact, combined with the rotating motion, gouged and punctured the steel shell of the tank, allowing the release of the pressurized LPG. After its escape, the LPG was ignited from some unknown source, thereby resulting in an explosion and large ball of fire which fragmented the tank into four main parts. This fire and explosion together with secondary fires caused burns in varying degrees to about fifty persons, sixteen of whom died immediately or at varying times during the ensuing days and weeks. Apparently, driver Verduzco died immediately as the result of a crushed skull, his body having been recovered thereafter from the irrigation canal a considerable distance south of the highway.

As stated, these suits were originally filed in the District Court of Maverick County against seven defendants, upon theories of recovery based upon allegations of negligence and strict tort liability. Defendants filed cross claims against each other for indemnity and/or contribution, except none were filed by or against Sames as Administrator of the Estate of Jesus Verduzco (who was also a plaintiff) or the heirs of Verduzco. Pleas of privilege filed by three of the defendants were sustained, leaving four defendants in the cases at the time they were consolidated, to wit: Lubbock Manufacturing Co. (designer and manufacturer of the LPG tank-trailer), Surtigas, S.A. (owner and operator of the tractor and trailer), Fontaine Truck Equipment Co. (manufacturer of the fifth wheel connecting the tank-trailer to the tractor), and William Sames, Administrator of the Estate of Jesus Verduzco, Deceased (Surtigas's driver).

Prior to jury selection, the liability insurance carrier for Surtigas unconditionally and gratuitously tendered its policy limits in the amount of one million dollars into the registry of the court to be distributed in any way the court considered fair and just, regardless of the jury verdict or liability. After the conclusion of the trial, the trial court ordered the Clerk to disburse this $1,000,000.00 to the plaintiffs on a certain pro-rata basis, not in issue here. Surtigas remained a defendant in the case because the insurer's tender of its policy limits simply protected the insurer from excess liability and did not remove the danger of a verdict against Surtigas in excess of its insurance coverage.

Also on October 5, 1977, immediately prior to trial, Defendant Fontaine and the Plaintiffs filed joint motions to sever Fontaine as a defendant, saying they had agreed upon a compromise settlement and that a severance was necessary so that their respective agreements could be consummated into final judgments. These motions were granted by the trial court; and pursuant thereto, separate cause files were prepared for each of the thirty-two suits. In these severed causes, the trial court rendered judgments against Fontaine totalling over $5,000,000.00, said judgments having been entered over a period of time during the trial of the main case as settlement agreements with the various plaintiffs had been respectively consummated. Fontaine eventually settled with all but two of the plaintiffs. Fontaine of course remained in the main case as a defendant because each of the other defendants (except Sames, Administrator) had cross-acted with each other for contribution and/or indemnity.

Because of the possibility of pre-trial publicity, this consolidated suit from which this appeal is taken was transferred after hearing by the trial court from Maverick County to Val Verde County, under the

provisions of Rule 257, Texas Rules of Civil Procedure. No complaint is made by any party concerning this transfer.

As stated before, this consolidated suit as of the time it went to trial consisted of thirty-two suits against four defendants, to wit, Lubbock, Surtigas, Fontaine and Sames, Administrator for (driver) Verduzco. After ten weeks of trial and two additional weeks of jury deliberation, the jury returned its verdict. Pursuant to the jury verdict and after the trial court had acted upon several post-verdict motions (some of which will be more particularly hereinafter dealt with), the trial court rendered judgments against Defendant-Appellant Lubbock totalling $14,723,969.00. Defendant-Appellant appeals from 14 of those judgments (plaintiffs' suits) totalling $2,672,317.00.

Taking into account the plaintiffs' judgments from which Lubbock appeals, together with cross points of error asserted herein, the parties to this appeal are:

(1) Plaintiff-Appellees (some of whom have filed cross points):

Francisco Pena Perez

Jesus Valdez Estrada

Mario H. Torres

Robert G. Davis

Eugenio Cruz

Jesus Maldonado and San Juana Maldonado

Daniel Pena

Elvira Valdez, Individually and as Next Friend of Mariano Valdez, a minor

Charles James Puente

Gilberto Oyervides and Eloisa M. R. Oyervides, Individually and as Next Friends of Omar Ali Oyervides, a minor

Antonio Garza

Gerado Carrillo

Humberto Longoria and Dolores Longoria, Individually and as Sole Surviving Heiress of Maria Estella Longoria, Lucia Longoria and Miguel Longoria

Thomas Olivo Vargas and Maria Ignicia Rodriguez Vargas, Individually and as Natural Parents and Sole Surviving Heiress of Arturo Vargas

Oscar Castano

William Sames III as Administrator of the Estate of Jesus Verduzco, and Francisca De Cedillo Vda Verduzco, Individually and as Next Friend of Jesus Verduzco, Jr., Hector Guadalupe Verduzco, Marta Alicia Verduzco and Virginia Verduzco, Minors, and Michaela Guevaria Vidua De Verduzco

(2) Defendant-Appellant: Lubbock Manufacturing Co.

(3) Cross-Defendant Appellee: Surtigas, S.A.

The jury found, or failed to find, as the case may be, as follows:

(1) The jury failed to find that driver Verduzco was negligent in any respect.

(2) The jury found that Verduzco was in the employment of Surtigas at the time and on the occasion in question.

(3a) The Lubbock tank-trailer in question was defectively designed in that the center of gravity of the tank was too high; and

(3b) That such defect was a producing cause of the occasion in question.

(4a) The Lubbock tank-trailer in question was negligently designed in that the center of gravity of the tank was too high; and

(4b) That such negligence was a proximate cause of the occurrence in question.

(5) Lubbock actively designed and manufactured the tank with the center of gravity such as it had at the time of the occurrence in question; that such act was a heedless and reckless disregard of others affected by it; and that such heedless and reckless disregard was a proximate cause of said occurrence.

(6) The weld in the manufacture of the right trunnion bracket of the Fontaine fifth wheel was defective;

(6a) which defect was a producing cause of the occurrence in question.

(7) In answer to the comparative negligence issue, the jury found Lubbock to be 100% negligent and Verduzco to be zero per cent negligent.

(8) The jury failed to find that the speed at which Verduzco drove the vehicle or the manner in which he turned same was a misuse of the vehicle.

(9) The jury made no answer to this proximate cause issue, and no answer was required, since it was conditioned upon an affirmative answer to Special Issue No. 8.

(10) In answer to the respective percentages that the defects found by the jury contributed to bring about the occurrence in question, the jury found as follows:

| Verduzco | zero percent. |
| Fontaine | 75%. |
| Lubbock | 25%. |

Special Issues Numbers 11 through 296 inclusive are damage issues concerning the various plaintiffs, not necessary to be specifically discussed at this point. We will discuss only those damage issues hereinafter in this opinion which have been attacked or drawn in question by points of error or cross-points.

After jury verdict, and after the trial court had acted upon various motions filed by certain of the parties, not necessary to detail at this point, the trial court entered judgments against Lubbock totalling $14,-723,969.00. Lubbock appeals from fourteen of such judgments totalling $2,672,317.00. We will discuss only those specific aspects or provisions of these judgments that are brought under attack by points of error or cross-points.

Appellant Lubbock assails the judgments appealed from by 39 points of error, the first of which asserts that the courts of Texas are without jurisdiction (or should decline to exercise jurisdiction) to adjudicate the adequacy of the LPG tank design that was approved by the Railroad Commission of Texas, whose authority and power in the LPG industry were delegated by the Legislature.

In 1959 the Legislature enacted the Liquefied Petroleum Gas Code, Article 6066d, Vernon's Texas Civil Statutes, which has been carried forward without substantial substantive change into the Natural Resources Code, the latter having become ef-fective September 1, 1977, the portion dealing with Liquefied Petroleum Gas in the new code being Sections 113.001 et seq. Appellant contends that the Legislature exercised its constitutional prerogative by delegating to the Railroad Commission the power to regulate the LPG industry; that by Section 3 of Article 6066d the Railroad Commission was vested with the authority to prescribe rules, regulations and/or standards pertaining to trucks, trailers, or other motor vehicles used or to be used in the transportation of LPG; that one of the requirements was that manufacturers of tank-trailer submit detailed plans and specifications to the LPG division (of the Railroad Commission) for determination as to whether or not the design was in compliance with its standards; that Lubbock submitted its detailed plans and specifications for the manufacture of the tank-trailer in question in 1963, which were approved by said Commission. Appellant then says since the Railroad Commission was granted jurisdiction over all aspects of the LPG industry, including safety standards, and since the design of the tank-trailer in question was approved by said Commission, that the trial court was without power to adjudicate the design thereof as "defective"; and under the constitutional doctrine of separation of powers, the judiciary does not have jurisdiction to approve or disapprove the adequacy of the design for the manufacture of vessels for the transport of LPG. We do not agree.

■ While *violation* of a statute (or in this case, action of the Railroad Commission which consists of delegated legislative action) usually is negligence per se, it does not follow that *compliance* with a statute (or action of the Railroad Commission) establishes the defendant's due care as a matter of law. Our Supreme Court has recently held that the fact that the Food and Drug Administration, a Federal agency, had previously approved a package insert warning did not relieve the drug company of its obligation to communicate an adequate warning to users of the dangerous drug in question. *Bristol-Myers Co. v. Gonzales* (Tex.1978) 561 S.W.2d 801, 804. Also see

*Muncy v. Magnolia Chemical Co.* (Amarillo, Tex.Civ.App.1968) 437 S.W.2d 15, NRE, which held that the adequacy of the warning of a dangerous product, although in compliance with statute, presents a question of fact. In *Muncy* the court said: "The statutes and regulations set minimum standards for those marketing economic poisons. A failure to comply would constitute negligence per se; however mere compliance does not mean the manufacturer or seller is free from negligence as a matter of law. *Rumsey v. Freeway Manor Minimax* (1st Houston, Tex.Civ.App.1968) 423 S.W.2d 387." Also, by way of analogy see *Housley v. Gilliam* (Tex.1975) 517 S.W.2d 531, 533, which holds that "proof that an individual did not violate any penal law would not necessarily preclude civil liability. It follows that simply because one may be statutorily relieved from criminal prosecution does not mean he will be universally exonerated from civil liability when his conduct falls below the minimum standard applicable to the civil law."

Based upon the foregoing authorities, we hold that the delegation of the legislative authority to the Railroad Commission hereinabove set out did not deprive the judiciary of jurisdiction to adjudicate the design of the tank-trailer in question as defective. We therefore overrule Appellant's first point of error.

Appellant's points two through thirteen, inclusive, assert the legal and factual insufficiency of the jury's findings that the tank's design was defective in that the center of gravity was "too high", which defective design was a producing cause of the accident in question; and that said tank was negligently designed in that the center of gravity was "too high", and that the height of the tank's center of gravity was a proximate cause of the accident in question. We overrule these contentions and hold that there is evidence of probative value to support each of these attacked jury findings, and that such findings are not so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust under the rule of *In re King's Estate* (1951) 150 Tex. 662, 244 S.W.2d 660.

Let us briefly review the physical facts surrounding the accident. At about 4:15 P.M. on April 29, 1975, Jesus Verduzco was driving the tractor-trailer in question westbound in the right lane of U.S. Highway 277 in the outskirts of and travelling towards the City of Eagle Pass, Texas. A white or light-colored car (which was never located after the accident) either made a left turn to enter an auto repair garage, said car coming directly across Verduzco's lane, or else said car came out of the area in front of the garage onto the highway. Several eyewitnesses testified, and the evidence is conflicting as to the direction and movement of the white car. At any rate the white car loomed up suddenly and unexpectedly in front of Verduzco and in his lane of traffic; whereupon, Verduzco turned his rig to his left and applied his brakes, leaving 178 feet of skid marks; and then, immediately after at least the tractor was in the eastbound lane of this two-lane highway, Verduzco turned back to his right to avoid oncoming traffic, which last turn brought about the overturn of the tank-trailer. There was conflicting testimony as to whether the tractor also overturned; however, it is undisputed that the "fifth wheel" broke. The tank-trailer turned over onto its left side and then rolled or skidded off the highway for some 108 feet, at which point it struck a corner of a one foot thick steel-reinforced concrete wall, which wall stood about 27 inches above ground level. This was the headwall of an irrigation canal which ran in a north-south direction intersecting the highway. The force of the impact, combined with the rotating motion, gouged and punctured the steel shell of the tank, allowing the release of the LPG. After its escape, the LPG became ignited, resulting in an explosion, thereby causing a large ball of fire which fragmented the tank into four main parts. This fire and explosion together with secondary fires caused burns in varying degrees to about 50 persons, sixteen of whom died immediately or at varying times during the ensuing days and weeks. Verduzco suffered a crushed skull and was killed in the accident.

There was a mountain of testimony concerning this disaster, including several eyewitnesses, accident reconstruction experts, mechanical engineers, metallurgists, and representatives of the State and Federal Government. There is evidence of probative force in support of each of the jury findings under attack as well as evidence to the contrary. The jury had the right to resolve the conflicts in the evidence and to make the findings as they did. We will not undertake to single out the testimony of individual witnesses, but will point out evidence that support the jury findings.

The tank-trailer at the time of the overturn was carrying 9,000 gallons of LPG (butane and propane). The tank carried an almost incomprehensibly large amount of stored-up energy. Expert testimony showed that the energy involved in merely changing the LPG from liquid into gas, even without an explosion, by release of same due to rupture of the tank, to be 5 million foot pounds. This was enough power to throw 100,000 pounds a distance of 49,675 feet, according to some testimony. Where combustion was added to the release of the LPG, as in our case, the force and energy release was of course much greater.

Several expert witnesses testified that the tank was unreasonably topheavy, that the tank had a propensity to tip over at foreseeable, low speeds during turning maneuvers, that safer and less tippable tanks could have been made; and this tank if so constructed would not have caused the disaster.

Expert testimony showed that the coefficient of friction of the tires on the highway at the time of the accident was .7 (seven tenths); that when Verduzco turned the rig back to his right, the radius of his turn was 143.8 feet; that the tractor was at an angle of from five to fifteen degrees to the tank-trailer at the time of turnover; and that the speed of the rig at the time the tank-trailer turned over was 35 miles per hour. The center of gravity of the tank-trailer was shown to be approximately 86 inches from the ground. In other words, there was evidence that the center of gravity was so high that the trailer would tip over at 35 miles per hour while travelling in a circle around a football field. There was expert testimony to the effect that if the center of gravity had been 20 inches lower, the tip-over would not have occurred; and that a tank could have been designed to comply with the criteria set forth by the American Society of Mechanical Engineers with a lower center of gravity; that with the center of gravity lowered 24 inches, tipping would be eliminated for all of the maneuvers expected of this tank; that this tank's high center of gravity rendered it unreasonably dangerous and defective, and that a truck driver would not be aware that the tank-trailer had dangerous tipover propensities during normal driving maneuvers. Expert evidence further showed that the trailer was unreasonably dangerous because it had a propensity to overturn at reasonable and foreseeable speeds during reasonable and foreseeable turning maneuvers, such as the 35 miles per hour and 143.8 foot radius involved in this accident; that it was unacceptable engineering practice to design a tank for use on the highways in hauling LPG under pressure without regard to the anticipated reasonable speeds and maneuvers. Expert testimony further showed that there were other designs that could have been used in the construction of a tank-trailer comparable to the one in question, that would have compiled with the ASME Code, such as the "neck-down" model, or the "possum belly" model, either of which would have had a low enough center of gravity to have prevented this accident. There is also evidence that Lubbock's designers gave no consideration to the "tipability" of its tanks even though they knew they would be involved in turning maneuvers and consequently might be easily overturned. The potential for disaster which one of these tank-trailers has when loaded with LPG adds to the seriousness of Defendant-Appellant's lack of concern for safety asserted by some witnesses.

■ Appellant contends that the failure of the fifth wheel was the sole cause of the turnover as a matter of law; however, the jury found that both Fontaine and Lubbock contributed to cause the explosion. There was evidence to show that the fifth wheel would never have been stressed if the tank's center of gravity had been lowered, thereby reducing its propensity to tip over and also reducing the leverage it exerted on the fifth wheel. Since the tank's high center of gravity set the tipover into motion and broke the fifth wheel, the jury properly rejected Appellant's sole cause argument. There was evidence the tank was so topheavy that it would have turned over regardless of whether the fifth wheel held or not. Experts testified that the failure of the fifth wheel is a foreseeable consequence of a topheavy tank. The two causes of the accident, to wit, the fifth wheel failure and the high center of gravity of the tank, were not separate and independent, but cooperating and concurrent causes of the accident; and the tipover, the break in the fifth wheel, and the ensuing explosion were connected by an unbroken chain of circumstances. We accordingly overrule Appellant's points of error two through thirteen, inclusive, and hold that the evidence is legally and factually sufficient to support the jury's findings that the tank's design was defective in that the center of gravity was too high, which defective design was a producing cause of the accident in question; and that said tank was negligently designed in that the center of gravity was too high, which was a proximate cause of the accident in question.

Defendant-Appellant Lubbock argues by point of error 14 that because Plaintiffs settled their disputes with Defendant Fontaine, each case being settled by both a written agreement and an agreed judgment, the doctrine of one satisfaction applied, and therefore Plaintiffs were barred from pursuing or receiving judgment for satisfaction against Lubbock. We overrule this contention. By point of error 15 Lubbock asserts the trial court abused its discretion by severing the Plaintiffs' causes of action against Fontaine from the main consolidated suit in which Lubbock, Fontaine, and Surtigas were Defendants. We do not agree.

Plaintiffs and Defendant Fontaine moved to sever Plaintiffs' respective complaints against Fontaine for the alleged reason that there had been agreements to settle with Fontaine. On October 6, 1977, the trial court entered orders severing such causes against Fontaine, entering each of Plaintiffs' suits against Fontaine under the same respective case numbers originally assigned to each such Plaintiff, with the added suffix "A" to each such case number. The orders of severance each recite "that a severance is proper and necessary for the purpose of consummating a proposed resolution of the causes of action against Fontaine." As the settlements were finalized, judgments were signed by the court in the severed cases each showing the approval of counsel by both sides. Such agreed judgments recite that the amounts received are "in full satisfaction of all claims against Fontaine Truck Equipment Company, a Division of Altamil Corporation, *only*." (emphasis supplied). Said judgments expressly recite, among other things:

"Plaintiffs are not releasing nor prejudicing their right to recover damages against any third parties and that both Fontaine _ _ _ _ _ and Plaintiffs intend to pursue their respective causes of action against third parties. Under the terms of said Covenant Not to Sue, Plaintiffs and Intervenor are to receive (here was stated the amount to be received, which varied with each Plaintiff) in full satisfaction of all claims against Fontaine Truck Equipment Co., a Division of Altamil Corporation, *only*, arising out of the accident referred to in the pleadings on file herein including expenses of every kind." (emphasis supplied).

■ It is manifest from the above language used in the judgments that no one intended that the settlements with Fon-

taine constituted full satisfaction and compensation for plaintiffs' injuries and that everyone concerned intended to pursue their cases against Lubbock and Surtigas.

As stated, each Plaintiff entered into a written settlement agreement with Fontaine, in which each Plaintiff covenanted not to sue Fontaine, and wherein each Plaintiff specifically reserved their respective rights to pursue any cause of action they might have against Lubbock, as evidenced by the language and recitations in such agreements, to wit:

"Whereas, it is the obvious intent of said plaintiff to continue to prosecute a cause of action against Lubbock Manufacturing Company and Surtigas, S.A., and it is the intention of Fontaine Truck Equipment Company, a Division of Altamil Corporation, to prosecute their cause of action for contribution and/or indemnity against Lubbock Manufacturing Co. _ _ _ _ _."

"It is distinctly understood, stipulated and agreed, that this instrument is not a release, but is only a covenant not to sue and an indemnity and save harmless agreement applying solely to Fontaine Truck Equipment Company, a Division of Altamil Corporation, and any employees or agents of Fontaine _ _ _ _ _, and that I am not in any manner releasing any cause of action which I have against any third-party or parties (including, but not limited to Lubbock Manufacturing Company) not a party to this agreement because of and arising out of the incident herein above mentioned; and, it is specifically understood that this agreement does not in any manner prejudice my right to recover damages against any third-party or parties, not a party to the agreement _ _ _ _ _."

Against this background, Appellant Lubbock asserts that the doctrine of one satisfaction bars the Plaintiffs from any right to recover against Appellant Lubbock, relying upon *Bradshaw v. Baylor University* (1935) 126 Tex. 99, 84 S.W.2d 703; *T. L. James & Co. v. Statham* (Tex.1977) 558 S.W.2d 865; and *Hunt v. Ziegler* (San Antonio, Tex.Civ.

App.1925) 271 S.W. 936, affirmed 280 S.W. 546 (Tex.Com.App.1926, judgment adopted).

We recognize the doctrine of one satisfaction as enunciated by the above-cited cases, but these cases do not apply to the case at bar.

To the contrary, the case now before us is governed by *McMillen v. Klingensmith* (Tex.1971) 467 S.W.2d 193; *Rexroat v. Prescott* (Amarillo, Tex.Civ.App.1978) 570 S.W.2d 457, NRE; and *Leong v. Wright* (14th Houston, Tex.Civ.App.1972) 478 S.W.2d 839, NRE. *Leong* quotes from a treatise by Professor Hodges at page 844 as follows:

"It is now well settled in Texas that a plaintiff may preclude himself from recovering from one of several tort-feasors without barring his action against the others if he does so by way of a covenant not to sue, or a release which reserves his action against the others, unless the amount paid for the release is in full satisfaction of his damages, in which event his cause of action is barred entirely."

In the case at bar, the Plaintiffs and Fontaine chose as the means or mechanics of settlement a written settlement agreement and an agreed judgment in each Plaintiff's case. Many of the Plaintiffs' cases contained parties who were minors, which necessitated the court's appointment of guardians ad litem, in which cases the entry of judgments were mandatory. In any event, the judgments entered in favor of the Plaintiffs against Fontaine were for the purpose of implementing the settlement process. The language could not have been clearer either in the settlement contracts or in the judgments that the Plaintiffs were merely covenanting not to sue Fontaine and were specifically reserving their rights to pursue their claims against Lubbock and the other Defendants, and that the settlements constituted satisfaction of their claims against Fontaine only, and that such settlements with Fontaine were not full and total satisfaction.

■ With regard to Appellant Lubbock's point of error 15, complaining that

the trial court abused its discretion in severing the Plaintiffs' suits against Fontaine from the main consolidated suit: this contention is without merit. The trial court has wide discretion in severing causes of action, which action will not be disturbed on appeal in the absence of a clear abuse of discretion. Rule 41, Texas Rules of Civil Procedure; *Landers v. East Texas Salt Water Disposal Co.* (1952) 151 Tex. 251, 248 S.W.2d 731. Also see *Kansas University Endowment Ass'n v. King* (1961) 162 Tex. 599, 350 S.W.2d 11, 19. Here the severance of the separate causes of action against Fontaine was proper and well within the trial court's discretion. Point 15 is over-ruled.

Appellant's sixteenth point of error asserts that the trial court erred in refusing Appellant's motion for mistrial based on Plaintiff-Appellees' alleged failure to disclose the nature of their settlement agreements with Fontaine. Appellant's point seventeen complains of the trial court's allocation of peremptory challenges among the parties. Points 16 and 17 will be discussed together. This trial proper commenced on October 6, 1977, and the evidence was concluded on December 13, 1977. On October 5, 1977, the day before commencement of the trial, most of the Plaintiffs and Defendant Fontaine filed motions to sever the Plaintiffs' cases against Fontaine, with the exception of two cases involving property damage. The stated purpose of such severance was that Fontaine had effectuated a settlement with such Plaintiffs. The trial court granted the motion for severance. On the evening of October 5, 1977, one of Plaintiffs' attorneys, a Mr. Hohman advised Mr. Ball, one of Lubbock's attorneys, that "Mary Carter" type agreements had been proposed by Fontaine to the Plaintiffs and would probably be entered into. The next day, October 6, 1977, Lubbock filed its amended motion to produce settlement agreements, in which it states that it is "satisfied" that Plaintiffs have entered into Mary Carter agreements with Fontaine. Let us point out the basic features of these Mary Carter agreements entered into

between these 30 Plaintiffs and Defendant Fontaine. The contracts had similar provisions in all cases except the respective amounts each Plaintiff was to receive. Basically, Fontaine was paying out a total of $5,000,000.00 in settlement to all these Plaintiffs. The crux of the settlement agreements was to the effect that if Plaintiffs thereafter recover from Lubbock, either by settlement or judgment, the Plaintiffs will get to keep the first $2,000,000.00, and beyond that Fontaine would be entitled to 50% of any recovery above the first $2,000,000.00 until it got its $5,000,000.00 back. In other words, in effect, Fontaine by such agreements had a financial interest in Plaintiffs' causes of action. The term, "Mary Carter" as a name for such type agreements originated in the 1967 Florida case of *Booth v. Mary Carter Paint Co.* (Fla.App.1967) 202 So.2d 8. See *General Motors Corporation v. Simmons* (Tex.1977) 558 S.W.2d 855 at page 858.

■ In order to further the policy of favoring the settlement of lawsuits, the traditional Texas rule has been that settlement agreements between some parties in a multi-party suit must be excluded from the jury. *McGuire v. Commercial Union Insurance Co. of New York* (Tex.1968) 431 S.W.2d 347, 352. An exception to this rule has been formulated in the case of *"Mary Carter"* agreements because such settlements result in the acquisition by the settling defendant of a direct financial interest in the plaintiff's lawsuit. *General Motors Corp. v. Simmons, supra.*

■ The agreements were not all consummated until October 31, 1977, some 25 days after trial had commenced. However, the jury panel were advised on voir dire that there was no adversity between Plaintiffs on the one hand and Fontaine on the other. The trial court after hearing on October 31, 1977, held that the agreements in question were discoverable by Lubbock, and required their production. Appellant Lubbock claims that this delay in disclosing

the nature of the agreements so prejudiced the trial of the case that a mistrial was compelled; whereupon, on November 1, 1977, Lubbock filed such a motion for mistrial, which the trial court overruled. Although we acknowledge that the revelation of the settlements and their contents came after the trial commenced, we disagree that Lubbock was entitled to a mistrial.

As stated, the trial commenced on October 6, 1977. On October 5, 1977, Plaintiffs and Fontaine announced that they had settled their differences and filed motions to sever all Plaintiffs' causes against Fontaine so that details of the agreements could be worked out, attorneys ad litem appointed by the court were necessary, and the individual cases reduced to judgment. As of October 5, 1977, only two agreements had been signed. The remaining 28 agreements involved over 90 individuals, including many minors and the attorneys ad litem representing them. All claims involved varying degrees of personal injury and damages as well as property damage; therefore all agreements had to be tailored, not only to meet the demands of Plaintiffs, but also to the end that the sum total of all Plaintiffs' recoveries would fit within the framework of the $5,000,000.00 total to be paid by Fontaine. In short, putting all of this together was a monumental task in logistics. In essence it took about 25 days to convert the tentative gross settlement into enforceable individualized agreements. As soon as all settlement agreements had been signed and reduced to judgments, the trial court required disclosure of the terms of the settlement agreements, to wit, on October 31, 1977. Moreover, the court ruled on October 31 and again on November 3 that Fontaine would not thereafter be allowed to cross-examine the Plaintiffs' witnesses. On November 9, 1977, the Supreme Court of Texas handed down its opinion in *General Motors Corp. v. Simmons*, supra; and immediately upon receipt of same, the trial court in the case at bar ruled that Lubbock would be entitled to recall for examination and impeachment any witness-

es that had previously been examined by Fontaine. Lubbock began its case in chief on November 23, 1977, and closed its case on December 13, 1977, without having ever requested the recall of a single witness for additional cross-examination or impeachment, and without having ever made even a limited offer of any settlement agreement or portion thereof for the jury's examination. In this connection, Plaintiffs made repeated offers to Lubbock throughout the course of the trial, to have any of their witnesses brought back at Plaintiffs' expense, and also repeatedly stated to the court and to Lubbock that Plaintiffs had no objection to the settlement agreements being offered into evidence in any manner Lubbock might see fit. We recognize that these settlement agreements contained recitations that would have been prejudicial to Lubbock had they been offered before the jury; however, these prejudicial portions could have been deleted to the end that the basic provisions of such agreements might have been presented to the jury.

In our opinion, the trial court complied with the mandates of *Simmons*, supra, and offered Lubbock every possible avenue to exploit the nature of Fontaine's Mary Carter agreements. If any error did result from the delay in disclosing the nature of the agreements, we believe Lubbock waived same, and that such error if any is harmless under this record.

█ Appellant further argues that Mary Carter agreements should be declared void as against public policy; however, there is no authority in Texas to support this position. This is a matter for determination by our Supreme Court of Texas, and not one which this court should address.

As stated, Appellant's seventeenth point of error complains of the manner in which the trial court allocated the peremptory challenges. Prior to the time voir dire commenced, it had been brought to the attention of the court and counsel for all parties that there was no adversity between Plain-

tiffs and Fontaine, and that settlements thereof were in the making. The trial court aligned the parties and allocated the jury strikes as follows:

| | |
|---|---|
| All Plaintiffs collectively (except Sames, Administrator for Jesus Verduzco Estate) | 6 |
| Fontaine | 4 |
| Lubbock | 6 |
| Surtigas | 4 |
| Sames, Administrator for Verduzco Estate (who was both a Plaintiff as well as a Defendant) | 4 |

The court further ordered the parties to exercise their peremptory challenges separately and apart from each other, which was done.

Because of the tentative settlement agreement reached by Plaintiffs and Fontaine on October 5, 1977, Appellant Lubbock claims that Fontaine had clearly aligned itself with the Plaintiffs and that Fontaine and Plaintiffs together should have received only six strikes total. Lubbock further argues that in truth and in fact it (Lubbock) was the "only real defendant" in the case. We do not agree with these contentions, and overrule point 17.

Rule 233, Texas Rules of Civil Procedure, provides that each party to a civil suit in a district court shall be entitled to six peremptory challenges. Article 2151a, Vernon's Texas Civil Statutes, also governs the allocation of peremptory challenges and provides:

"Peremptory challenges; equalization of number.

"After proper alignment of parties, it shall be the duty of the court to equalize the number of peremptory challenges provided under Rule 233, Texas Rules of Civil Procedure, Annotated, in accordance with the ends of justice so that no party is given an unequal advantage because of the number of peremptory challenges allowed that party."

The great majority of the decisions construing Article 2151a, in conjunction with Rule 233, have held that, in multiparty suits, the number of strikes allocated to each party need not be precisely equal, and that the trial court has discretion to make a fair allocation. *Austin Road Co. v. Evans* (Ft.Worth, Tex.Civ.App.1973) 499 S.W.2d 194, NRE; *Dean v. Texas Bitulithic Co.* (Waco, Tex.Civ.App.1976) 538 S.W.2d 825, no writ; *King v. Maldonado* (Corpus Christi, Tex.Civ.App.1977) 552 S.W.2d 940, NRE. In an appeal claiming an abuse of discretion by a trial court, the burden is on the complaining party to show that the trial resulting in an adverse judgment was materially unfair. *Texas Employers Ins. Ass'n v. McCaslin* (1958) 159 Tex. 273, 317 S.W.2d 916. In our opinion Appellant Lubbock has not met this burden.

Our Supreme Court has held that "[t]he alignment of parties is to be made not only on the basis of the pleadings but from a determination of the interests of the parties by information disclosed from pre-trial procedures and which has been specifically called to the attention of the court." *Perkins v. Freeman* (Tex.1974) 518 S.W.2d 532 at page 534. Although hindsight is often better than foresight, the action of a trial court in apportioning strikes must of necessity be evaluated in terms of information available at the time the challenges are allocated—not on the basis of changes in the alignment of parties which may possibly occur thereafter during the course of the trial. In the case at bar, even though a tentative settlement agreement had been reached by Plaintiffs and Defendant Fontaine by the time of commencement of the trial, only two enforceable agreements had at that time been signed and were in existence, whereas 28 agreements had yet to be consummated. During the 25 days of trial in which these 28 agreements were being brought into existence and reduced to judgment, there were many opportunities for publicity and other causes to thwart or prevent the consummation of these settlements. Until such time as these agreements became

properly enforceable, Fontaine faced substantial liability from the prosecution of these 28 claims. We disagree with Lubbock's contention that it was the "only real defendant" in the trial of this case. Each of the three Defendants, to wit, Lubbock, Surtigas, and Fontaine had cross-claimed against the other two defendants for indemnity and contribution, and genuine adversity existed between all parties at the time the allocations were made. We believe the trial court properly considered all this information in justiciably allocating the challenges, and we cannot say that said court abused its discretion in the allocation made. Appellant's point 17 is accordingly overruled.

■ Appellant's points 20 and 21 respectively contend that the jury's failure to find Verduzco negligent in driving at an excessive rate of speed, and in its failure to find that Verduzco's asserted speed and manner in which he turned the vehicle was a misuse of the vehicle, all were so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. *In re King's Estate* (1951) 150 Tex. 662, 244 S.W.2d 660. We overrule these points of error. Without detailing the evidence, suffice it to say that we hold that there is considerable evidence of probative value to support these negative jury findings, and that such findings are not so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

■ Appellant Lubbock argues by its point 23 that because Lubbock's defect was found by the jury to have contributed 25% to the accident and Fontaine's defect contributed 75% to the accident, that Lubbock should have 75% of the damages deducted from the amount rendered against Lubbock instead of 50% as the trial court actually allowed in the judgment.

By special issue number 10 the jury was asked the respective percentages that the defects found by the jury contributed to bring about the accident, to which the jury answered as follows:

| | |
|---|---|
| Verduzco: | zero percent. |
| Fontaine: | 75 percent. |
| Lubbock: | 25 percent. |

In other words, here Lubbock had previously been found by the jury to be both strictly liable and negligently liable, Fontaine had been found strictly liable, and Verduzco had been previously charged but acquitted of both negligence and misuse of the equipment. Special Issue No. 10 was no doubt submitted on the basis of *General Motors Corp. v. Hopkins* (Tex.1977) 548 S.W.2d 344, in order to determine the percentage of misuse if any by Verduzco, and not for the purpose of apportioning liability among Defendants Lubbock and Fontaine. *Hopkins* held that a plaintiffs' recovery may be reduced by his unforeseeable misuse of a product that proximately causes the damaging event. Accordingly, in Special Issue No. 10, Verduzco's alleged misuse was to be compared with Lubbock's and Fontaine's defects so that Verduzco's recovery could be reduced by the percentage of his misuse. Manifestly Special Issue No. 10 was a defensive issue regarding Verduzco only.

■ What Appellant Lubbock seeks by point 23 is 75% contribution from Fontaine, by way of a reduction in Plaintiffs' damages. But the comparative responsibilities of joint tort-feasors must be based upon either Article 2212, V.T.C.S., (contribution between tort-feasors) or Article 2212a (commonly called the "Comparative Negligence" statute). Contribution among joint tort-feasors did not exist at common law and it exists today in Texas only pursuant to statute.

In the case at bar, the trial court's judgment granted 50% contribution to Lubbock (because of Fontaine's settlements with Plaintiffs) under Article 2212 and the doctrine of *Palestine Contractors, Inc. v. Perkins* (Tex.1964) 386 S.W.2d 764.

■ Our Supreme Court in *General Motors Corp. v. Simmons* (Tex.1977) 558 S.W.2d 855 at page 862 has answered the

question presented by appellant's point 23. The *Simmons* holding requires that where one joint tort-feasor is strictly liable and the other joint tort-feasor is strictly and/or negligently liable (as in the case at bar) that Article 2212 applies, to the end that damages are not apportioned on a comparative percentage basis. Article 2212a can be used *only* to apportion damages among joint tort-feasors both or all of whom are *negligent.* Therefore the trial court properly applied Article 2212 and the *Palestine Contractors'* doctrine by apportioning the damages equally against Fontaine and Lubbock by giving Lubbock a 50% credit on each judgment; that is to say, by reducing the judgments against Lubbock by 50% from the total damages. Point 23 is overruled.

■ Appellant's point 24 asserts the trial court erred in refusing to credit Lubbock with the amounts disbursed to Plaintiffs out of the one million dollars paid into the registry of the court by the liability insurers of Surtigas.

As hereinabove stated, before trial commenced, Surtigas's liability insurer unconditionally paid into the registry of the court their policy limits of one million dollars. The insurers asked the court to prorate or disburse the money in a manner that the court deemed fair, reasonable, and equitable "to all plaintiffs, intervenors, and/or claimants who possess claims or causes of action for damages arising from" the subject accident.

On February 13, 1978, the same date the trial court signed judgments against Lubbock, the court signed an order disbursing the funds on the basis of a certain pro-rata formula, not in issue here. The court directed that the jury's award was not to be reduced to any extent by reason of this disbursement of the Surtigas insurance money; and in the judgments against Lubbock, Lubbock was allowed no credit for the amounts so paid to the various Plaintiffs. The trial court's position was that since the jury found no liability against Surtigas, the

one million dollars was a "windfall" for Plaintiffs. We do not agree.

Specifically, Lubbock argues that it should have been credited with the following amounts disbursed to the following Plaintiffs (same being those named in the 14 cases which Lubbock has appealed to this court), to wit:

| CAUSE NO. | PLAINTIFF | AMOUNT PAID |
|---|---|---|
| 11844: | Francisco Pena Perez | $ 9,079.57 |
| 11846: | Jesus Valdez Estrada | $ 517.53 |
| 11847: | Mario H. Torres | $ 6,144.40 |
| 11848: | Robert G. Davis | $ 646.82 |
| 11849: | Eugenio Cruz | $ 926.38 |
| 11853: | Jesus Maldonado | $ 212.14 |
| | San Juana Maldonado | $ 476.84 |
| 11854: | Daniel Pena | $ 1,299.81 |
| 11857: | Mariano Valdez | $ 1,828.19 |
| 11859: | Charles (Carlos) James Puente | $ 1,457.45 |
| 11860: | Gilberto Oyervides | $ 673.17 |
| | Eloisa Oyervides | $ 797.31 |
| | Omar Ali Oyervides | $ 34,972.98 |
| 11861: | Antonio Garza | $ 10,157.01 |
| 11863: | Gerardo Carrillo | $ 37,324.25 |
| 11869: | Humberto Longoria | $ 13,240.62 |
| | Dolores Longoria | $ 13,557.73 |
| | Tomas Olivo Vargas | $ 4,903.58 |
| | Maria Rodriguez Vargas | $ 6,081.43 |
| | Oscar Castano | $ 226.51 |
| 11871: | Jesus Verduzco (Estate of) | $ 21.39 |
| | Francisca Cedilla de Verduzco | $ 3,243.65 |
| | Jesus Verduzco, Jr. | $ 389.59 |
| | Hector Guadalupe Verduzco | $ 443.96 |
| | Marta Alicia Verduzco | $ 471.14 |
| | Virginia Verduzco | $ 552.68 |
| | Michaela Guevara de Verduzco | $ 90.61 |
| | TOTAL: | $149,736.74 |

We sustain Appellant's point 24, and hold that the trial court's judgments against Lubbock in the 14 cases hereinabove set out should be reduced respectively by the amounts paid to each such Plaintiff out of the Surtigas insurance money. See *McCrary v. Taylor* (Eastland, Tex.Civ.App. 1979) 579 S.W.2d 347, NRE, and the authorities therein cited on page 350. Restatement of the Law, Torts (2nd Ed. 1979, Section 885(3) is particularly applicable, to wit:

"A payment by any person made in compensation of a claim for a harm for which

others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment." In the comment under this section (3) on page 335 is contained the following language peculiarly applicable to the case at bar:

"f. Payments made by one who is not himself liable as a joint tortfeasor will go to diminish the claim of the injured person against others responsible for the same harm if they are made in compensation of that claim, as distinguished from payments from collateral sources such as insurance, sick benefits, donated medical or nursing services, voluntary continuance of wages by an employer, and the like. *These payments are commonly made by one who fears that he may be held liable as a tortfeasor and who turns out not to be.*" (emphasis added). This rationale is also in harmony with the doctrine of "one satisfaction" hereinbefore discussed in this opinion. Some Appellees argue that the collateral source rule would prevent Lubbock from being entitled to the credits in question; however, we hold that here the collateral source rule does not apply, but instead we follow the reasoning of *Restatement of Torts,* supra, and *McCrary v. Taylor,* supra. Appellant's point 24 is sustained.

Appellant's Point No. 27 complains of a fundamentally erroneous lack of conformity between the judgment and the pleadings in the case of the minor plaintiff, Omar Ali Oyervides. Omar, a four-month-old infant was sleeping in his crib at his grandparent's home at the time of the explosion, and he was seriously burned as a result of the fire

spreading from the explosion. His parents were not personally present at the time of the explosion and were therefore not personally injured, but they brought suit both individually and as next friends of Omar for the damages flowing from Omar's injuries. Said Plaintiffs originally sought recovery of $800,000.00, the exact language reading as follows:

"As a result of the explosion and fire Omar Ali Oyervides, a Minor, sustained severe burns and as a reasonable medical necessity required medical care and hospitalization. Plaintiffs have paid or incurred liability to pay expenses for past medical services and hospitalization. As a reasonable medical probability Omar Ali Oyervides, a minor, will in reasonable probability incur a loss of earning capability in the future. Omar Ali Oyervides, a minor, has suffered a great amount of physical pain and mental anguish in the past, and will in reasonable medical probability suffer physical pain and mental anguish in the future. Omar Ali Oyervides, a Minor, is disfigured as a result of the burns sustained. Gilberto Oyervides, Individually, and Eloisa M. R. Oyervides, Individually, Gilberto Oyervides and Eloisa M. R. Oyervides as Next Friends of Omar Ali Oyervides, a minor, therefore sues (sic) the Defendants for the sum of $800,000.00 for personal injuries."

In the course of trial, the trial court allowed a Plaintiffs' trial amendment increasing the damages by $1,000,000.00,[1] and, at the time of judgment, the Plaintiffs' pleadings (Seventh Amended Petition) with regard to damages read as set forth originally but with the following exception:

". . . Gilberto Oyervides, individually, and Eloisa M. R. Oyervides, individually, and Gilberto Oyervides and Eloisa M. R. Oyervides, as next friends of Omar Ali Oy-

---

1. In Plaintiff's Sixth Amended Petition, the purpose of the trial amendment was set forth as follows:

"By way of trial amendment presented and granted in open Court, the Plaintiffs plead that in addition to this *minor's* prayer for relief prayed for in Paragraph V above (refer-

ring to the original $800,000.00), the Plaintiffs hereby plead and pray for additional damages to the *minor,* Omar Ali Oyervides only, in an amount of $1,000,000.00 for damages and injuries to said *minor.*" (emphasis supplied).

ervides, a minor, therefore sues (sic) the defendants for the sum of $800,000.00 for personal injuries, and for the additional sum of $1,000,000.00 for the minor, Omar Ali Oyervides."

Separate damage issues were submitted for the father Gilberto and the mother Eloisa and for the child Omar. The jury found the following damages:

*Gilberto Oyervides*

Loss of services of Omar—$2,000.00

Past medical expenses for Omar—$148.99

Medical expenses for Omar until his 18th birthday—$35,000.00.

*Eloisa M. R. Oyervides*

Loss of Omar's services—$2,000.00

The value of nursing services furnished by her to Omar in the past—$42,000.00.

*Omar Ali Oyervides*

Physical pain and mental anguish in the past—$600,000.00.

Physical pain and mental anguish in the future—$300,000.00.

Loss of earning capacity after age 18—$500,000.00.

Disfigurement—$400,000.00.

Physical impairment—$100,000.00.

Medical expenses after age 18—$5,000.00.

Total for Omar—$1,905,000.00.

The trial judge rendered judgment that the parents take nothing from Lubbock and that Omar receive $900,000.00 (½ of $1,800,000.00 pleaded, per *Palestine Contractors*). Lubbock now contends that such judgment does not conform to the pleadings and that the maximum judgment possible for Omar under the pleadings was $500,000.00 because Omar had, in effect only pleaded for $1,000,000.00 (to be reduced by ½ under *Palestine Contractors*).

■ We disagree with Lubbock's contention. It is true, as Lubbock contends, that the pleadings are somewhat ambiguous regarding any apportionment of relief sought; however, Lubbock has waived any defect in such pleadings by its failure to level special exceptions at such pleadings. Rules 90 and 91, Texas Rules of Civil Procedure; *Hanley v. Oil Capital Broadcasting Ass'n* (1943) 141 Tex. 243, 171 S.W.2d 864, 866; also see *Yeager Electric & Plumbing Co., Inc. v. Ingleside Cove Lumber & Builders, Inc.* (Corpus Christi, Tex.Civ.App.1975) 526 S.W.2d 738, no writ; and *Appell Petroleum Corp. v. Moreman Tire Co.* (Eastland, Tex.Civ.App.1967) 416 S.W.2d 470, no writ. In the absence of special exception, pleadings will be liberally construed in favor of the pleader to support the judgment. *Scott v. Gardner* (1941) 137 Tex. 628, 156 S.W.2d 513, 141 A.L.R. 50; *Golden State Mutual Life Ins. Co. v. Hayes* (Waco, Tex.Civ.App. 1957) 301 S.W.2d 147, NRE.

■ It is not unreasonable to construe these pleadings to the effect that all $1,800,000.00 sued for were designed or sought to compensate Omar only. Omar was the only one of these Plaintiffs that was physically injured, and the petition states that the damages sought were for "personal injuries." Appellant Lubbock insists that such a construction of the pleadings is impossible, especially since damage issues were submitted separately for each of the three Oyervides Plaintiffs. The submission of these issues is irrelevant to the construction of the pleadings, because Lubbock also failed to offer any objections to the submission of these damage issues. We hold that these pleadings can be construed to support the judgment, and we accordingly overrule Appellant's point 27.

Appellant Lubbock has other points and contentions, all of which we have carefully considered, and we overrule all of same as being without merit.

■ In cross points, Appellees Perez et al. and Appellees Longoria et al. contend that the trial court erred in denying Plaintiffs leave to file trial amendments increasing the amounts prayed for concerning their personal injuries up to the amounts of

damages awarded by the jury. These requests for leave to amend were made after the jury had returned a verdict in excess of the amounts originally prayed for.

The Texas Supreme Court has held that "the matter of permitting a trial amendment to be filed is addressed to the sound discretion of the trial court and his order will not be disturbed [on appeal] unless it *clearly* appears that he abused his discretion." (emphasis added). *Vermillion v. Haynes*, 147 Tex. 359, 215 S.W.2d 605, 609 (1948). Late presentation alone may be a sufficient basis for a trial court's denial of leave to file. *King v. Skelly*, (Tex.1970) 452 S.W.2d 691. The fact that a trial amendment changes the complexion of a case may also support a trial court's refusal of the amendment. *Burnett v. File*, (Waco, Tex. Civ.App.1977) 552 S.W.2d 955, NRE. Because the complexion of a case may be markedly influenced by the amount in controversy, the trial court in this case was justified in denying the post-verdict amendments which sought to increase the damages pleaded. *Cabrera v. Delta Brands, Inc.*, (Texarkana, Tex.Civ.App.1976) 538 S.W.2d 795, NRE; *Williams v. General Motors Corp.* (1st Houston, Tex.Civ.App.1973) 501 S.W.2d 930, NRE; *Precision Motors v. Cornish* (Dallas, Tex.Civ.App.1967) 413 S.W.2d 752. Appellees' cross points regarding the failure of the trial court to grant leave to file these trial amendments are therefore overruled.

Appellees have other cross points, all of which we have carefully considered, and we overrule same as being without merit.

We accordingly reform the fourteen judgments from which Appellant Lubbock has appealed, by reducing each such judgment by the amounts respectively paid to such Plaintiffs-Appellees out of the Surtigas insurance money as hereinabove set out, and as reformed, said judgments are affirmed.

REFORMED AND AFFIRMED.