**INTERNATIONAL ARMAMENT CORPORATION, et al.,**
**Petitioners,**

v.

**Clifford Wayne KING, Respondent.**

**No. C–3343.**

Supreme Court of Texas.

Feb. 20, 1985.

Rehearing Denied April 10, 1985.

Hutcheson & Grundy, Darrell E. Reed, Jr., Houston, Scott, Douglass & Keeton, W. Page Keeton, Austin, for petitioners.

Longley & Maxwell, Joe K. Longley, Austin, for respondent.

WALLACE, Justice.

This is a products liability case. Clifford Wayne King was injured when his "Star Gauge" shotgun misfired. The shotgun was manufactured by Armas Erbi S. Coop. (Armas Erbi), a Spanish corporation, imported by Petitioner, International Armament Corporation (Interarms), and sold to King by Oshman's Sporting Goods Company, Texas, Inc., (Oshman's).

Pursuant to a jury verdict, the trial court rendered judgment for King which awarded him $234,053.60 actual damages against Oshman's and Interarms, $1,500,000 punitive damages against Interarms, $4,400,000 punitive damages against Armas Erbi, and attorneys' fees. Armas Erbi made no appearance. The court of appeals affirmed the judgment of the trial court. 674 S.W.2d 413. Interarms and Oshman's do not contest the award of actual damages; however, they do contest the award of punitive damages and attorneys' fees.

The pivotal issue before us is whether there is any evidence to support the award of punitive damages against Interarms. We hold there is, and therefore affirm the judgment of the court of appeals.

The gun in question is a side by side double barrel shotgun which King purchased from Oshman's in September, 1979. On November 24, 1979, King and some of his relatives were target shooting on a relative's farm. The shotgun malfunctioned and King's stepfather took the weapon to inspect it. When his stepfather completed the inspection of the shotgun and closed the receiver, the shotgun fired, striking King in the leg. At all times during the inspection process the weapon's safety was engaged. It is undisputed that the shotgun fired while the safety was engaged and without anyone touching the triggers.

The shotgun in question utilized the Anson-Deli automatic safety design. This safety operates only on the trigger, as op-

posed to operating on the hammer and firing pin. In other words, when the safety is engaged the trigger cannot be moved; however, the safety does not prevent the hammer from striking the firing pin which causes the gun to fire. This Anson-Deli type automatic safety is a common design and has been widely used for over 100 years.

The jury findings pertinent to the punitive damages issue in this case are:

(1) Interarms failed to give an adequate warning that the gun could fire while the "safety" was engaged but while the triggers were not engaged;

(2) the failure to warn rendered the shotgun unreasonably dangerous;

(3) the failure to warn was an unconscionable action;

(4) Interarms knowingly engaged in such unconscionable action;

(5) the failure to warn constituted reckless, wanton and grossly negligent conduct;

(6) Interarms knowingly engaged in such conduct;

(7) such conduct was a proximate cause of King's injuries.

■ In reviewing a no evidence point we consider only the evidence and inferences tending to support the jury verdict and disregard all evidence to the contrary. If there is any evidence of probative value to support the jury verdict we must affirm. *Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965). The judgment of the court of appeals can be affirmed only upon a finding that there is some evidence of probative value that Interarms' failure to warn was a producing cause of King's injury and, further, that such failure constituted reckless, wanton and grossly negligent conduct.

■ This Court held in *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922, (Tex. 1981):

The essence of gross negligence is not the neglect, which must, of course, exist. What lifts ordinary negligence into gross negligence is the mental state of the defendant; that is what justifies the penal nature of the imposition of exemplary damages. The plaintiff must show that the defendant was consciously, i.e., knowingly, indifferent to his rights, welfare and safety. In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care. Such conduct can be active or passive in nature. ... All actions or circumstances indicating a state of mind amounting to a conscious indifference must be examined in deciding if there is some evidence of gross negligence.

The relevant evidence is primarily derived from the testimony of four expert witnesses. The first expert called by Interarms was Russ J. Moure, its Director of Engineering. Moure supervised the examination of shotguns as they were received by Interarms. He was extremely well-informed about guns and gunsmithing, having been in the gun business for 35 years. In addition, he was quite familiar with the intricate workings of firearms in general and shotguns in particular. Moure performed a complete inspection of the first two shotguns received from Armas Erbi. The inspection included a close examination of both the internal mechanism of the weapons and of the external "cosmetic" appearance. For these reasons, Moure's testimony is the most probative and his testimony will be summarized first.

Moure testified that he knew the "Star Gauge" shotgun, as designed, could fire if the trigger was not touched, even with the safety engaged, if the sear and the sear notch on the hammer fit together poorly. He added that this phenomenon would occur if the breech were closed abruptly.

Moure agreed that the shotguns which he inspected were not assembled with a high degree of care and were not finished with meticulous care; the internal parts of the shotgun, such as the sears, hammers and locking levers, were not completely machined but were partially handfiled; and the moving parts were not completely polished for smooth operation. Moure also stated that the firing pins on the first shot-

guns that he inspected measured .068 inches although the recommended standard was only .050 to .055 inches. Furthermore, after the inspection of the first two shotguns, Moure wrote an intercompany memorandum which revealed that the actions of the guns were "extremely hard to open" and required considerable manipulation to make them open or close. He noted it would have been more desirable if the action of the gun were softer and more precise. Moure also added there were substantial numbers of "cosmetic" defects. Such defects included rust and corrosion, scarred stocks and improper fit between stock and metal.

There was evidence that Interarms visually inspected each shotgun received and that it rejected those with a poor external appearance. Of 700 shotguns received by Interarms in the first two shipments, 150 were rejected for "cosmetic" defects because they would not be marketable. Of the remaining 550, only two of every 25 were internally inspected for safety and mechanical defects. There was also testimony that Interarms ceased importing the shotguns in 1975 due to a lack of quality control at the Armas Erbi factory.

Moure stated he was not aware of any safety defects in the shotguns, but he admitted that Interarms itself had no formal quality control procedure for the guns that it imported; that no written reports were prepared after the internal inspection of the guns; and, that there is no record of whether Interarms inspected King's shotgun. Interarms knew that the shotguns would be sold to and used by members of the general public who possess varying skills and knowledge regarding shotguns. Moure testified that some defects were found in every shotgun which underwent a documented inspection.

The other three expert witnesses are Charles Tedford, Charles E. Hudak and John Milton Vance, Ph.D. Tedford was called by King and qualified as an expert. He is a gunsmith who, at the time of trial, had approximately ten years experience in the field. Vance, a professor of engineer-ing at Texas A & M University, whose doctorate degree is in the field of mechanical engineering, was also called by King and qualified as an expert. Hudak is a chemist with more than 20 years experience as a gunsmith. The relevant testimony of Tedford, Hudak and Vance will be summarized in addition to Moure's.

King's first expert witness, Charles Tedford, testified that any gunsmith could have quickly disassembled the shotgun in question and easily observed that the sear and hammer did not fit together properly. It was his opinion that importers should inspect each gun to determine if it is safe, and if they do not inspect the internal workings of the gun, they should issue a written warning. He testified that another manufacturer, the Reuger Corporation, stamps a warning on its guns. Tedford added that Interarms' failure to inspect each gun was such an entire want of care as would constitute a conscious indifference to the welfare and safety of people who might use them.

King's second expert witness, John Milton Vance, Ph.D., testified that the hammer and sear of the gun in question were of very poor quality, that the ridge was very roughly made, and that the edge of the sear was crudely manufactured. He testified that the Anson-Deli safety design used in the shotgun only prevents the trigger from being pulled, but allows the gun to fire in many cases even while the safety is engaged, especially if the parts fit together poorly. This testimony echoes Interarms' Director of Engineering, Moure. Vance added that most people who use shotguns expect the safety to always prevent the gun from firing. Interarms' own expert witness, Charles Hudak, testified that because he knew that this shotgun had a propensity for firing while its safety is engaged, he would have issued a warning cautioning that no safety mechanism is entirely foolproof.

Additionally, there is evidence that Interarms printed a brochure which described the shotgun in question as being meticulously assembled, with all parts completely

machined and highly polished. Mr. Moure testified that the guns did not meet the description set out in the brochure. Nonetheless, Interarms continued to distribute the brochure to dealers and the general public for over a year after it determined that the statements made in the brochure were false. This does not directly relate to the defect in the shotgun in question, or the likelihood of safety related defects in other "Star Gauge" shotguns; however, the jury was free to consider this evidence in determining the mental state of Interarms.

We find that the above testimony constitutes evidence upon which the jury could base its finding of gross negligence. Interarms knew of the poor workmanship of the guns it inspected. Interarms also knew that the guns could misfire if the internal mechanism did not fit properly; yet, it chose not to inspect each gun or issue a warning about the safety system. The evidence was sufficient for the jury to infer that Interarms intentionally did not inspect the safety related parts of the guns, but was interested only in the cosmetic appearance of the guns as appearance primarily affected the sale of the weapon.

■ Finally, Interarms and Oshman's contend that the court of appeals erred in sustaining the trial court's award of attorneys' fees based upon TEX.BUS. & COM. CODE ANN. § 17.50(d) (Vernon Supp.1982) of the Deceptive Trade Practices—Consumer Protection Act (Act). This provision provides that a consumer who "prevails" under the Act may recover attorneys' fees. The jury found that the "Star Gauge" shotgun was unfit for its intended purposes and that such unfitness was a producing cause of the injuries. Section 17.50 of the Act states, "(a) A consumer may maintain an action where any of the following constitutes a producing cause of actual damages: ... (2) breach of an express or implied warranty." Since the jury found that Interarms and Oshman's breached the implied warranty of fitness set forth in TEX.BUS. & COM.CODE ANN. § 2.315 (Vernon

1968), King is entitled to recovery of attorneys' fees.

We hold that the court of appeals correctly disposed of Interarms' points of error concerning the wording of special issues and the jury's finding of producing cause.

The judgment of the court of appeals is affirmed.

GONZALEZ, J., not sitting.