FORD MOTOR COMPANY, Appellant,

v.

Mr. and Mrs. William R. DURRILL,
et al., Appellees.

No. 13–84–390–CV.

Court of Appeals of Texas,
Corpus Christi.

May 29, 1986.

Rehearing Denied Aug 29, 1986.

M.W. Meredith, Jr., Meredith & Donnell, Corpus Christi, Lewis Plunkett, Plunkett, Gibson & Allen, San Antonio, for appellant.

David L. Perry, Bob J. Spann, Spann & Smith, Russell H. McMains, Edwards, McMains & Const, Corpus Christi, for appellees.

Before NYE, C.J., and KENNEDY and DORSEY, JJ.

## OPINION

NYE, Chief Justice.

This is an action brought by William and Shirley Durrill against the Ford Motor Company following an accident in which their daughter, Devary, was killed. The Mustang II vehicle Devary was driving was hit from behind by a 1972 Lincoln driven by James B. Rathmell. The car burst into flames after impact. Devary Durrill died seven and half days later of burns she sustained in the fire.

In answer to special issues, the jury found that a design defect in the automobile's fuel system and Ford's failure to warn of the dangers of fire following rear end collisions were producing causes of the occurrence. The jury also found that negligence in design and failure to warn were proximate causes of the accident. They awarded $6,861,663.00 in damages to the Durrills and assessed $100,000,000.00 in exemplary damages against Ford. The trial court ordered the Durrills to file a remittitur of $80,000,000.00 of the exemplary damages as a condition of overruling Ford's motion for new trial. Ford Motor Company brings fifty-six points of error contesting liability, damages and various evidentiary rulings. The Durrills seek reinstatement of the jury's gross negligence award and prejudgment interest. This expertly tried case took more than seven weeks to complete, resulting in a record in this Court of nearly 7,000 pages and more than 300 exhibits. We reform and will affirm the trial court's judgment on the condition of a remittitur by the appellees.

In appellant Ford's first and second points of error it argues that the jury findings on gross negligence are immaterial because as a matter of law a corporation may not be grossly negligent. Ford contends that the essence of gross negligence is a mental attitude or state of mind which a corporation itself cannot have. It concedes that a corporation may be held legally liable on the basis of the acts and state of mind of natural persons under circumstances in which those acts and state of mind can properly be imputed to the corporation. Ford argues that the Durrills made no attempt to prove knowledge, state of mind, or acts or omissions of any individual Ford employee which would provide an evidentiary predicate for corporate liability.

A review of Texas case law is contrary to Ford's argument. It shows that corporations may be held liable for gross negligence. In *Ford Motor Co. v. Nowak*, 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.), this court upheld a

gross negligence award of $4,000,000.00 against Ford Motor Company. We did not predicate liability upon the acts of individual employees of Ford. Likewise, in *Rawlings Sporting Goods Co. v. Daniels,* 619 S.W.2d 435 (Tex.Civ.App.—Waco 1981, writ ref'd n.r.e.) a punitive damage award of $750,000 was upheld against a company which manufactured football helmets. Recently, in *International Armament Corp. v. King,* 674 S.W.2d 413 (Tex.App.1984) *aff'd,* 686 S.W.2d 595 (Tex.1985), the Supreme Court held the evidence was sufficient for the jury to infer that *Interarms* intentionally did not inspect the safety related parts of the guns, but was interested only in the cosmetic appearance of its product. Again, in *Monsanto Co. v. Johnson,* 675 S.W.2d 305 (Tex.App.—Houston [1st Dist] 1984, writ ref'd n.r.e.), Monsanto Corporation was found grossly negligent. In each of these cases, the Courts held the manufacturer or the company liable for gross negligence without specifically requiring an identified individual to be held grossly negligent.

■ This is not a case in which corporate liability arises from the negligent or intentional act of an employee whose conduct was authorized or ratified by a person acting in a managerial or supervisory capacity. Rather, it involves complex company policy decisions which were made by Ford management. As such, we find that it is proper to hold Ford accountable for gross negligence. These were corporate decisions which cannot be imputed to an individual engineer, a specific division, or a single manager.

Ford also argues that the special issue which asked the jury to find what sum of money, if any, should be assessed as exemplary damages against Ford Motor Company *for the death of* Devary Durrill, was an immaterial issue because it asked the jury to award damages that the Durrills cannot legally recover. Ford's argument, in essence, is that the special issue was so word-ed that it allowed the plaintiffs to recover under the Wrongful Death Statute rather than under the Survival Statute,[1] which would have been proper. *See Hofer v. Lavender,* 679 S.W.2d 470 (Tex.1984). Ford's objection to the special issue was that there was no evidence to support exemplary damages and that submitting this issue in a trial which involved both strict liability and ordinary negligence was improper. There was no objection that the issue was immaterial or improperly worded.

■ The trial court is vested with broad discretion in determining the form of special issues to be submitted to the jury. The issue submitted may have been more properly worded to focus on the defendant's conduct as illustrated in the State Bar of Texas, Texas Pattern Jury Charges PJC 80.10 (1982) as follows:

Find from the preponderance of the evidence what sum of money, if any, should be assessed against [the defendant] as exemplary damages?

Or the issue could have asked:

What sum of money, if any, should be assessed as exemplary damages against Ford to the survivors of Devary Durrill?

Even though we find that the issue in question might have been worded differently, it was not improper.

In points of error five through fourteen, Ford challenges the evidence as legally and factually insufficient to support the jury's findings that a defectively designed Mustang II was either the producing or proximate cause of the occurrence; and that Ford's failure to warn users of the danger of fires following collisions was either the producing or proximate cause of the occurrence. In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well established test set forth in *Pool v. Ford Motor Company,* 29 Sup.Ct.J. 301 (April 5, 1986) (not yet published); *Dyson v. Olin Corp.,* 692 S.W.2d

---

1. These statutes have been codified in TEX.CIV. PRAC. and REM.CODE § 71.001 et seq. (Vernon

1986).

456 (Tex.1985); *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965); *Allied Finance Co. v. Garza*, 626 S.W.2d 120 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Tex.L.Rev. 361 (1960).

The test for determining a design defect was reiterated in *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 62 (Tex.1983). The test requires a balance between the utility of the product and the risks involved in its use in order to find that a design is unreasonably dangerous. The Court, in *Kindred*, pointed out that in *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 746 (Tex.1980) they had stated:

The jury may consider many factors before deciding whether a product's usefulness or desirability are outweighed by its risks. Their finding on defectiveness may be influenced by evidence of a safer design that would have prevented the injury. [Citations omitted.] Because defectiveness of the product in question is determined in relation to safer alternatives, the fact that its risks could be diminished easily or cheaply may greatly influence the outcome of the case.

... This feasibility is a relative, not an absolute, concept; the more scientifically and economically feasible the alternative was, the more likely that a jury may find that the product was defectively designed. A plaintiff may advance the argument that a safer alternative was feasible with evidence that it was in actual use or was available at the time of manufacture. Feasibility may also be shown with evidence of the scientific and economic capacity to develop the safer alternative.

Whether a product is defectively designed must be judged against the technology existing at the time of its manufacture. A plaintiff may argue that a more scientifically and economically feasible alternative was in use or available at the time of manufacture. Ford does not challenge the special issues that concern whether there was a defect, but argues that there was a total failure of proof that the design of the car was a cause in fact of the fire.

■ The issue of causation is generally a question of fact: 1) when general experience and common sense will enable a layman to fairly determine the causal relationship between the event and the condition; 2) when scientific principles, (usually proved by expert testimony), establish a traceable chain of causation from the condition back to the event; and 3) when there is probable causal relationship that is shown by expert testimony. *Lenger v. Physician's General Hospital, Inc.* 455 S.W.2d 703, 706 (Tex.1970); *Travenol Laboratories, Inc. v. Bandy Laboratories, Inc.*, 608 S.W.2d 308 (Tex.Civ.App.—Waco 1980, writ ref'd n.r.e.). An expert opinion is legally sufficient evidence to establish a causal relationship between the condition and the event. Producing cause has been properly defined "an efficient, exciting, contributing cause which, in a natural sequence, produced the injuries complained of, if any." *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975). Proximate cause adds the element of forseeability. In a negligence case, a party establishes liability by proof that defendant's negligence was a proximate cause of the event; in a products liability case involving a defective product, liability is established by proof that a product was placed in the stream of commerce containing a defect which was a producing cause of the event. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex. 1984). In reviewing the evidence concerning causation, we examine the testimony taking into consideration all of the above stated rules of law.

Here, the evidence showed that the car Devary Durrill was driving burst into flames shortly after impact. Marion McClintock, a witness to the accident, testified that she saw flames even before the Durrill vehicle hit the ground after being struck by the Rathmell vehicle. Rathmell, the driver, was estimated to have been traveling between forty-five and seventy-five miles per hour at the time of the

accident, depending on which witness the jury chose to believe concerning speed. Rathmell admitted both his negligence and the fact that he was intoxicated at the time of the accident. Neither issue is contested on appeal.

The record shows that the fire was fuel fed and that Devary Durrill died of burns rather than injuries of another sort sustained in the accident. The fire was the result of fuel which escaped from the tank of vehicle as a result of a number of holes which were in the tank after impact. The evidence showed that there was massive deformation of the fuel tank. Ford argues that no car's gas tank could have sustained the impact of an accident such as this one.[2]

Dr. Robert Brenner, a mechanical engineer, testified as an expert witness for the Durrills. He said the filler neck pullout, differential bolts puncturing the tank, a strap hanger in front of the tank which caused a tear and a puncture in the rear tank corner made by either the spring shackle bolt or one of the spring shackle assembly members were reflective of the classic Pinto failure mode which Ford had earlier recognized. He testified that those failure modes could have been eliminated by various design changes and modifications. He indicated that the design and production of a fuel tank which can be punctured by the differential bolts constitutes a design defect. He opined that under forseeable impact conditions, the environment in which the fuel tank was located was hostile to the continued survival of the fuel systems without failure of various parts. He indicated that all four failure modes involved a risk of burn death and serious burn injury. Brenner opined that the "hazardous environment" problems could have been solved in the ten year period beginning in 1965. He testified that the Pinto-Bobcat-Mustang were treated by Ford Motor Company as essentially the same vehicle regarding fuel system integrity. Dr. Brenner also testified that the preferable location for the fuel tank would be either in front of the rear axle or over the rear axle. According to Brenner, a design approach would have substantially solved the problem of maintaining the integrity of the fuel system under forseeable rear impact conditions.

Gilbert Kurop, a mechanical engineer, testified for the Durrills. He testified that with proper engineering analysis and design, the failures that occurred in the Durrill vehicle could have been prevented. He said that the problems in the Durrill vehicle were not major design or engineering problems. The design failures in the Durrill car were similar to ones observed in Ford crash tests. He said a smooth face differential and a shield could have been designed between the rear axle and the fuel tank to prevent punctures of the tank. He indicated that the loading on the strap hanger bracket could be changed and a protective shield could be placed on the shackle. Kurop also testified that it would have been possible to keep the area of the spring shackle from being punctured by a hostile environment for only a small amount of money. According to Kurop, revising the filler pipe design to prevent pull-out during impact would have been possible and desirable. This would involve affixing the filler rigidly to the tank and adding a rubber connection which would, in essence, allow the connection to break away during a crash, but would keep the filler with the tank, so there would be no holes in the tank from which fuel could escape. It was Kurop's opinion that if all of the holes in the tank had been sealed and if the tank been built properly, there would have been space available in the "collapse" of the vehicle for the tank to expand enough so that it would not burst. He testified that all of these things could have been done by Ford.

Conflicting evidence was presented by Ford experts. Rudolph Persico testified that because of the severity of the accident there would have been massive failure of the tank in any event. Regardless of changes, the tank was compressed which built internal pressure and with a full tank,

2. See exhibit attached.

the gas had nowhere to go and of necessity would rip open. He testified that it was the severest accident he had ever seen. Persico disagreed with Plaintiff's expert regarding an over-the-axle design. He said that an over-the-axle design places the fuel tank behind the rear passenger seat and would allow for fuel leakage in the passenger compartment if an accident occurred. Harold MacDonald testified that bladders suggested by the plaintiff's experts wouldn't work because in tests they revealed durability problems such as abrasions and cracking. Charles Warner testified that bladders will not withstand assault without give. In any kind of foreseeable impact, a bladder tank will break. MacDonald also testified that the "break-away" filler pipe suggested by plaintiff's expert was actually subject to damage from other parts of the car and could result in fuel leakage anyway. Ford's testimony was that not until 1976 were they able to make an effective shield of this nature.

It is clear to us that competent experts testified for both sides and came to very different conclusions concerning whether a defect existed and whether any defective condition caused the fire. In matters such as this, the jury's task becomes more important and more difficult. Nevertheless, it remains their function to listen to the evidence and judge the credibility of the witnesses and decide the weight to be given their testimony.

■ We find that the testimony of plaintiff's experts which showed that with proper engineering analysis and design approach, the failures which occurred in the Durrill vehicle could have been avoided is evidence that a design defect or negligence in design caused the occurrence in question. The jury could have inferred from the testimony that if proposed design changes had been made, the fuel tank would not have ruptured and the fire would have been prevented. Under the circumstances, we cannot say that the jury's findings on causation are against the great weight and preponderance of the evidence.

■ The appellants argue further that there is no evidence or factually insufficient evidence to show that Ford's failure to warn was either a producing or proximate cause of the occurrence. Mr. Durrill testified at trial that at one time he owned a Pinto in addition to the Mustang II. He received a recall letter from Ford concerning the Pinto, ordered his employees not to drive it, and eventually sold the car. Mr. Durrill testified when he received the Pinto recall letter, he called the Ford dealership and was informed that the recall letter did not apply to Mustang II vehicles. He testified that had he been given a warning of the dangers of the Mustang, Devary would not have been driving it at the time of the collision. This testimony when taken in conjunction with Dr. Brenner's testimony that the Pinto and Mustang II were treated essentially the same by Ford as they related to fuel integrity problems and his testimony that Ford should have sent recall letters to Mustang II owners as well is sufficient evidence to show causation.

■ In appellant's third and fourth points of error, Ford asserts that there is no evidence or factually insufficient evidence to support the jury's findings of gross negligence. Texas courts define "gross negligence" as that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex.1981). In determining whether there is gross negligence, the same no evidence test should apply as to any other fact issue. If the jury finds gross negligence, the defendant has the burden of establishing that there is no evidence to support the finding. In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look at all of the surrounding facts, circumstances and conditions, not just individual elements or facts.

■ The defendant's state of mind distinguishes gross negligence from negligence. State of mind may be inferred from

the defendant's actions. *Williams v. Steves Industries, Inc.,* 699 S.W.2d 570 (Tex.1985). The Supreme Court continues to emphasize the conscious indifference component of gross negligence in recent decisions. *Id.* at 573; *International Armament Corp. v. King,* 686 S.W.2d 595 (Tex.1985); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 933 (Tex.1983). In *Williams,* the Court described the test for gross negligence as both an objective and subjective one. A plaintiff may prove gross negligence by proving that the defendant had actual subjective knowledge that his conduct created an extreme degree of risk. A plaintiff may objectively prove a defendant's gross negligence by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk. *Williams v. Steves Industries, Inc.,* 699 S.W.2d at 573. Conscious indifference, as defined by the Court, denotes, a *decision,* in the face of impending harm to another party to not care about the consequences of the act which may ultimately lead to that harm. (Emphasis ours).

The evidence presented concerning gross negligence was conflicting. Ford voluntarily adopted a twenty mile per hour moving barrier standard for all Ford vehicles in 1973. It is undisputed that no manufacturer was designing its vehicles to meet a higher standard at that time. In 1970, the National Highway Traffic Safety Administration proposed a thirty mile per hour fixed barrier standard. The fixed barrier crash test is much more stringent because in a moving barrier test some crash energy is absorbed by the test vehicle being propelled forward at a certain speed into a brick wall. Ford told the government in response to its proposal to require a thirty mile per hour barrier test that the difference between risk of injury with a twenty or thirty mile per hour fixed standard would be statistically small. On the other hand, Dr. Brenner testified that his analysis of the documents was that 75% of all fire reported cases would not be prevented by a twenty mile per hour moving standard, but would be prevented by a thirty

mile per hour standard. The evidence also showed that the Ford engineers were of the opinion that they could have met the thirty mile per hour barrier objective, if Ford had so mandated. There was also evidence that Ford had tested the "break away" filler pipe and had also determined that a nitrile nylon liner was capable of sustaining impacts at higher impact levels, but did not use either. A crash test on a 1971 Pinto revealed pull-out of the fuel tank and leakage through a puncture in the upper right front surface of the fuel tank, which was caused by contact between the fuel tank and a bolt on the differential housing. There was also ample evidence for the jury to conclude that the Ford Pinto and the Mustang II were essentially the same vehicle with regard to fuel system integrity, that Ford knew it, but chose to not to warn Mustang II owners as they had done the Pinto owners.

■ We have reviewed all of the evidence and find that there was ample evidence from which the jury could have found that Ford was grossly negligent. It is apparent from the record that Ford knew that there was a risk of fuel tank punctures and resulting fires, had the technology to substantially reduce the risk of such fires, but did not do so. There was also evidence from which the jury could infer that for the most part Ford did not act until mandated by the government. Ford saved more than two hundred million dollars over a three year period by delaying implementation of modifications of its fuel intregrity system.

■ In its sixteenth point of error, Ford claims the trial court reversibly erred in allowing testimony concerning Bonnie Watkins' attempts to escape the fire. Three witnesses testified that there was another person inside the Durrill vehicle who was unable to escape from the car and who burned to death. We find that the circumstances surrounding the accident were relevant to the issues to be decided in this case and the testimony concerning the presence of Bonnie Watkins was necessarily a part

of the description of the events of that evening.

Ford's seventeenth and eighteenth points of error claim that the trial court erred in admitting the transcript of a conversation among President Nixon, John Ehrlichman, Henry Ford II and Lee Iacocca and in admitting the deposition of Douglas Toms, then acting head of the National Highway Traffic Safety Administration (NHTSA), concerning the material contained in the transcript. Ford argues that the exhibit was immaterial, irrelevant, unauthenticated and was hearsay and that Toms' testimony was hearsay.

■■■ The exhibit, submitted under a certificate signed by the Deputy Director, Nixon Project, the National Archives, stated that it was a true and correct copy of a transcript by the Archives of a tape in its custody. Rule 902 states that extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to a document bearing a seal purporting to be that of· the United States and a signature purporting to be an attestation or execution. TEX.R.EVID. 902(1). We find that the transcript meets the requirements set forth in the rules of evidence and no further authentication was needed.

Second, Ford argues that Douglas Toms' testimony respecting matters contained in the tape transcription was inadmissible hearsay. The transcription, from a meeting on April 27, 1971, involved a discussion with the president regarding the need of the government to be aware of costs and problems involved in implementing government regulations. Toms was not present at the time the tape was made, nor was he aware of the meeting among the before mentioned individuals. He testified, however, that Iococca and Henry Ford, II, had expressed to him many times that "safety has really killed all of our business." They had also expressed to him the notion that the Japanese were a threat to the automobile business. They told him that they wished the government was not as stringent regarding safety. All of this information was within Toms' personal knowledge.

■■■ We find that this evidence was not irrelevant or prejudicial. Exemplary damages were sought in this case. It was therefore incumbent upon the Durrills to prove that Ford acted with conscious indifference to the rights and safety of others. This evidence clearly bears on this issue.

■■■ In appellant's nineteenth point of error Ford urges that the trial court erred in excluding the testimony of Harold MacDonald, chief engineer for Ford, concerning his attitude toward fire safety. The testimony, offered by Ford in a Bill of Exception, was that MacDonald's father was killed when the fuel tank of his automobile caught fire and he was incinerated. Ford argues that this testimony was also relevant to MacDonald's state of mind. The Durrills' case required proof of Ford Motor Company's conscious disregard for safety and not the intentional or reckless act of an individual Ford employee. "Some Care" evidence will not vitiate a finding of gross negligence because the appellate Courts will apply the traditional "no evidence" test to see if there is some evidence to support the jury's findings. *Burk Royalty Co. v. Walls*, 616 S.W.2d at 921. In any event, a judgment should not be reversed on appeal for excluding evidence unless the trial court committed error that was reasonably calculated to cause and probably did cause the rendition of an improper verdict. *Mollinedo v. Texas Employment Comm'n*, 662 S.W.2d 732 (Tex.App.—Houston [1st Dist.] 1983, n.r.e.); *Rowland v. City of Corpus Christi*, 620 S.W.2d 930 (Tex.Civ. App.—Corpus Christi 1981, writ ref'd n.r. e.). The trial court's exclusion of the testimony was not reversible error. TEX.R. CIV.P. 434.

In appellant's twentieth point of error, Ford urges that the trial court erred in admitting the Pinto recall letter and testimony relating to the Pinto recall. The Durrills argue that the evidence was relevant to show Ford's conscious disregard for the public safety. Rule 407(b) allows a written ratification by a manufacturer of a

product defect to be admitted against the manufacturer on the issue of existence of the defect to the extent that it is relevant. The fact that recall letters are admissible is settled by the existence of Tex.R.Evid. 407(b). The circumstances for admission in this case are somewhat unusual in that the letter was admitted to show both Ford's failure to warn of an alleged similar defect in the Mustang II and to show that a defect existed in the Mustang II by showing its similarities to the recalled Pinto.

Dr. Robert Brenner testified that the Ford Motor Company should have sent a recall letter like the "Pinto" letter to Mustang owners as well. He testified that the safety related defect which precipitated the Pinto—Bobcat recall was very similar, if not identical to the safety related defect that Ford knew existed in the Pinto-Bobcat and Mustang.

■ The evidence of the Pinto recall was relevant both to the defect issue and the failure to warn. It was incumbent upon the Durrills to show by independent evidence that the Mustang II was defective at the time of injury in order for the letter to be admissible to show the existence of a defect. *See* Blakely, *Article IV: Relevancy and Its Limits* 20 Hous.L.Rev. 151, 220 (1983). The Durrills established, by independent evidence, that the Mustang II was defective in the same manner as the Pinto. Additionally, we find that the evidence was admissible to illustrate Ford's failure to warn.

■ In points of error twenty-three through twenty-six, Ford complains of the admission into evidence of exhibits which were documents relating to federal standards which were either not adopted or not applicable to the Mustang II at production time. These exhibits included Ford's response to a government proposal to adopt a rollover standard in 1976, a proposal by the government to meet a thirty mile per hour fixed barrier standard by January 1, 1973, Ford's response to that proposal and government standards which related to Ford's procedure for reporting laboratory tests. The majority of them were generat-

ed by Ford and as such were properly admitted to allow the plaintiffs to prove the consciousness with which Ford made its safety decisions.

■ In Ford's twenty-seventh point of error it urges that the district court erred in admitting into evidence documents and testimony respecting a proposed shield which could protect the gas tank for the 1970 Maverick. In a products liability action, a plaintiff may argue that a safer alternative was feasible by introducing evidence that such an alternative was in use or available at the time the product was manufactured. *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 746 (Tex.1980). Evidence of the scientific and economic capacity to develop a safer alternative is also proper. While Ford is correct that there was no evidence of any design similarity between the 1970 Maverick and the 1974 Mustang II, the evidence was relevant to show that Ford had developed a shield concept for one of its vehicles.

■ Ford argues in its twenty-second point of error that the trial court erred in excluding from evidence documents and testimony showing that Ford executives personally leased Pinto automobiles. Ford argues that this evidence was relevant to show that Ford executives thought that the Pinto was a safe vehicle. We find that the exclusion of this evidence was not reversible error.

■ Ford contends by its twenty-eighth point of error that the trial court erred in excluding from evidence photographs of the rear structure of a 1977 Toyota Corolla. Ford claims that the photographs showed an example of industry custom relative to gasoline tank placement which was relevant to the negligence issue and should have been admitted. Appellant also urges that the testimony was relevant to impeach the qualifications of the Durrills expert who testified that a vehicle with a fuel tank in such a hostile environment should not be used.

We agree with Ford that the photographs would have been properly admitted, but find that their exclusion was certainly not so grave as to constitute reversible error. TEX.R.CIV.P. 434.

Ford argues in its fifteenth point of error that the trial court erred in admitting into evidence a videotape containing excerpts from films depicting car collisions followed by fires. In its twenty-ninth through thirty-third points of error Ford complains that improper jury argument by the Durrills' counsel requires reversal. Ford specifically points to the admission of the questioned videotape during argument as reversible error. The first two excerpts of the videotape show rear end collisions followed by immediate fires. The third excerpt depicts a 1967 Ford occupied by life-like dummies. One was a small child. In what appears to be slow motion, the film shows flames surrounding one of the dummies resembling a small child. After offering the exhibit for general purposes during the trial and having it excluded by the court, the plaintiffs again offered the film to show the size and magnitude of fuel-fed fires. The court then admitted the exhibit for this limited purpose. Kurop, the Durrills' expert, testified that the film correctly illustrated the character and magnitude of a fuel-fed fire. In his testimony, Kurop specifically brought attention to the flames entering the passenger compartment near the child.

This videotape was again shown to the jury during final argument. The Durrills' attorney prefaced its introduction by the following language:

"I guess one of the things that is a little bit hard to articulate in a case like this is the whole concept of being burned.

You know, throughout history being burned to death has been considered-going back to Biblical times, I guess to Nebuchadnezzar, condemned three prophets to the fiery furnace, and the time that Saint Joan of Arc was burned at the stake. Being burned alive has always been considered the absolutely most horrible death that a man—can happen to a man. It is something to do to your most bitter and horrible and hated enemy in barbaric times.

Ford chose to do that, to allow this to happen unnecessarily to people they didn't even know for 209 million dollars. You know, Judas Iscariot only got thirty pieces of silver. My, how the price has gone up. They chose to burn alive. You know, I just want you to see—I want you to remember just one thing. This is a crash test that was done in 1967 on a Ford car, the ignition was artificial. This is what Ford knew as early as 1967 would happen when their cars leak fuel, and there was an ignition source present."

(The videotape was then shown to the jury.)

MR. PERRY: "1967; that is one of the Severy crash tests, and they decided that they would just let that keep happening. They decided there was no improvement necessary."

Appellant made numerous objections to the exhibit when it was offered into evidence, even for the limited purpose, but did not object to it being shown without any instruction or limitation during jury argument. Although the Court did not allow appellees to introduce the tape to show Ford's knowledge of what happens to its cars when fuel leaks, nevertheless, appellees' counsel specifically asked the jury to consider the tape for that purpose during his argument.

Appellant argues here that there was no predicate for admitting the exhibit. Ford also argues the films were out-of-court experiments for which no foundation was laid. They complain the character and magnitude of fuel-fed fires were not relevant to this case. The test cars were not the same. One of the test car fires was artificially ignited. Ford contends that permitting the jury to see the tape during the essential jury argument was prejudicial error for which no objection was necessary.

In order to reverse an improper jury argument, the complainant has a difficult burden. The complaining party must

prove: "1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of a statement, or a reprimand by the judge." *Standard Fire Insurance Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979); *Ford Motor Co. v. Nowak,* 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

In the rare instance that improper unobjected jury argument is incurable, the complaining party has the additional burden to show the argument by its very nature, degree and extent constituted harmful error. The evidence as a whole must be examined to determine the argument's effect on material findings of the jury and reversal must then come from an evaluation of the case, as a whole. From all of these considerations, the complaining party must show the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on proper proceedings and evidence. We conclude, after following this test, the admission of this film during the jury argument was not reversible error.

After the videotape was concluded, appellee's counsel informed the jury that this case "literally had world-wide implications." He asked the jury to find that Ford had made a defective gas tank, was negligent and grossly negligent and asked them:

> to award the monetary damages, the actual damages and the exemplary damages that they (Ford) ought to pay to make them know that when they kill people in this country for the reasons they did, that, number one, they are going to have to pay what it costs, and number two, they will be punished.

The jury found what appellees' counsel asked. They awarded appellees $106,861,663.00.

Although appellees' counsel's use of the videotape during final argument was improper, we do not find that it caused reversible error. It may, however, have contributed to the excessiveness of this verdict. The jury argument appears to mesh the actual and exemplary damages in this case, and in essence appellees' counsel suggested to the jury that they award monetary and actual damages as well as exemplary damages in order to punish Ford.

We note, however, there were no objections at trial to any of the arguments of which Ford complains. Therefore, the specific objectionable statements must each be incurable in order to constitute reversible error or their cumulative effect must be incurable. We have examined each of Ford's complaints and find that there was error in the jury argument. However, we find that the effect of the specific arguments could have been cured by objection and instruction and the cumulative effect of counsel's statement is not so grave as to be reversible.

In points of error thirty-four through thirty-six Ford argues that the survival and wrongful death issues submitted were so worded that they invited the jury to award double damages. Specifically, Ford argues that the issue which fixed compensatory damages for Devary Durrill's injuries was improper because it asked the jury to consider: a) *physical pain and suffering* which Devary Durrill suffered and, b) *mental anguish* she suffered from the time of injury until her death. Ford claims that "suffering, pain, and anguish" are inseparably intertwined. Ford also contends that the identical issues submitted to the jury to compensate the Durrill's for the loss of their child authorized double recovery. These issues asked the jury to consider: (a) loss of the child, by which is meant the loss of the right of a parent to enjoy that affection, solace, *comfort,* companionship, society and *assistance,* (b) the *mental anguish* suffered by the parent in the past and which, in reasonable probability, will be suffered by him in the future and (c) pecuniary loss resulting from the death of Devary Durrill, taking into account the *care, maintenance, support, services,* advice, counsel and *reasonable contributions of a*

*pecuniary value.* (Emphasis ours). Ford argues that the term "assistance" in subsection (a) duplicates "care, maintenance, support, services, in subsection (c); and advice, counsel and reasonable contributions of a pecuniary value. "Comfort" in subsection (a) overlaps at least "care, maintenance, support, services" in part (c). It also claims that the terms affection, solace, companionship and society in subsection (a) would necessarily be included in the term mental anguish referred to in part (b).

▄▄▄ Each of these issues was prefaced by a limiting instruction which told the jury to consider each element of damage separately, and not to include damages for one element in any other element. The trial court has broad discretion in the submission of special issues. *Jacobs v. Jacobs,* 670 S.W.2d 312 (Tex.App.—Texarkana 1984, writ ref'd n.r.e.); *Baker Marine Corp. v. Moseley,* 645 S.W.2d 486 (Tex.App. —Corpus Christi 1982, writ ref'd n.r.e.). The survival issue separates into subsections physical pain and suffering and mental anguish. While often grouped, we find that these two elements are distinguishable and not duplicitous. Mental anguish signifies a state of mind which includes contemplation by the party of the disfigured or maimed condition which he is in as a result of an injury. Physical pain and suffering connotes the physical sensations when injury has occurred to the body. The trial court did not err in submitting the issues as he did.

Appellant's thirty-seventh and thirty-eighth points were waived in its reply brief.

In appellant's thirty-ninth and fortieth points of error, Ford claims that recovery based on Ford's failure to warn is not proper because it is unsupported by the pleadings and constituted a direct comment on the evidence. We disagree. The pleadings were general to which no special exceptions were filed. As such, we construe the pleading in the light most favorably to the plaintiffs.

▄▄▄ Ford also argues that the special issue on their failure to warn constitutes an impermissible comment on the weight of the evidence because it suggests an answer. It is undisputed from the evidence that Ford did not warn consumers of any problem concerning its Mustang II vehicle. It is clear that in order for the trial court to submit the issue to the jury, it must have made the legal determination that a duty to warn existed. In Texas, the issue of whether a duty exists *vel non* is a question of law to be determined by the Court. *St. Paul Insurance Co. v. Rahn,* 641 S.W.2d 276 (Tex.App.—Corpus Christi 1982, no writ); *Webb v. City of Lubbock,* 380 S.W.2d 135 (Tex.Civ.App.—Amarillo 1964, writ ref'd n.r.e.). Therefore, we find that the trial court properly submitted the issue and it did not constitute an impermissible comment on the evidence.

▄▄▄ In points of error forty-one through forty-six, Ford complains that the damages awarded to Mr. and Mrs. Durrill and the damages for Devary Durrill's injuries were not supported by sufficient evidence and are excessive. Ford asks us to reverse and remand or suggest a substantial remittitur. Our authority to determine whether a verdict is so excessive that a remittitur is required derives from our jurisdiction over fact questions. *Pon Lip Chew v. Gilliland,* 398 S.W.2d 98, 103 (Tex. 1965); *Bond v. Otis Elevator,* 388 S.W.2d 681, 687 (Tex.1965). In determining whether a verdict is excessive, we consider the evidence in a light most favorable to the award. *Roberts v. Tatum,* 575 S.W.2d 138 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Southern Pacific Transportation Co. v. Peralez,* 546 S.W.2d 88 (Tex. Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.); *T.J. Allen Distributing Co. v. Leatherwood,* 648 S.W.2d 773 (Tex.App.— Beaumont 1983, writ ref'd n.r.e.); *see Missouri Pacific Railroad Co. v. Lehmberg,* 12 S.W. 838 (Tex.1889). If, after a review of the evidence in the light most favorable to the jury award, we are of the opinion that the verdict and judgment are excessive, and if the case should be reversed for that reason only, we shall suggest to the party, or the attorneys, the time within

which they may file a remittitur of the excess. TEX.R.CIV.P. 440.

All of the testimony presented at trial showed that Devary Durrill's parents have been profoundly and permanently affected by her death. Mrs. Durrill testified that after Devary's death they sold their home and lake lot because it was simply too painful to be places where they were once a happy family. Mr. Durrill can't remember things as well as he once did, he is reclusive, anti-social and feels the joy of life is missing. There was testimony by hospital personnel that the Durrills' decision not to tell Devary that she was gravely ill increased their stress considerably because for the seven days that she lived, they had to continually present a cheerful front for her.

The injuries to Devary Durrill were devastating and painful. The evidence showed that she sustained third degree burns over seventy to eighty percent of her body. It is uncontradicted that Devary was conscious and alert for most of the time during her last seven days. Janice Richey, a nurse in the burn unit at Memorial Hospital, testified that Devary's face was red and black, swollen and looked horrible. Richey said that at one point she gave Devary a mirror, but she never asked for one again. She said that although Devary received pain medication, it was somewhat limited because of potential respiratory problems. Richey testified that Devary screamed during the debridement process and was in pain. Calvin Brown, Devary's boyfriend, testified that Devary knew there was a chance she would die. He said that he would hear her screaming in pain. According to him, she spoke to him about the fear she felt that he would no longer love her.

■ The Wrongful Death Act authorizes recovery of damages sustained by a surviving spouse, children or parents for the death of another. In *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex.1983), the Supreme Court expanded recovery under the Act to include mental anguish as a result of a child's wrongful death. In *Cavnar*,

adult children were allowed to recover for the loss of companionship and mental anguish resulting from their mother's death. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 at 551 (Tex.1985).

Here, the special issue asked the jury to award damages to Mr. and Mrs. Durrill based upon their mental anguish, loss of society and pecuniary loss as a result of their loss of their child. The jury awarded Mrs. Durrill $2,050,000.00 and awarded Mr. Durrill $2,300,000.00. The jury was also asked to award damages which would have compensated Devary Durrill for her physical pain and suffering, mental anguish, disfigurement and loss of physical capacity. The jury assessed her damages at $2,500,-000.00.

■ The purpose of assessing damages for the wrongful death of another is to compensate the living for the death of a loved one. The injured party is entitled to be made whole. This should be accomplished by allowing the victim full compensation for every kind of damage suffered.

Here, we find that the jury's award of more than $2,000,000.00 to each of the parents for the loss of their daughter and $2,500,000.00 to Devary Durrill is not supported in the evidence and is excessive.

This Court has generally either looked to other cases as precedent in determining excessiveness of damages or determined whether a verdict is excessive based upon the circumstances of the case at bar. *See First State Bank of Corpus Christi v. Ake*, 606 S.W.2d 696, 703 (Tex.Civ.App.— Corpus Christi 1980, writ ref'd n.r.e.); *Dover Corp. v. Perez*, 587 S.W.2d 761 (Tex. Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

Because the Supreme Court has only allowed recovery for mental anguish for the death of a child since 1983, there is a paucity of case law that we can examine to see how others have viewed reasonable compensation for such a loss by a parent. In *Madisonville Independent School District v. Kyle*, 658 S.W.2d 149 (Tex.1983), the jury awarded parents of a deceased

child $184,023.10 for pecuniary loss, loss of companionship and society, and past and future mental anguish resulting from their son's death. The amount was reduced to $100,000.00 by the Supreme Court to comply with the limited liability of the school district under the Texas Tort Claims Act. In *Gulf States Utilities Co. v. Reed*, 659 S.W.2d 849 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.), the jury awarded $500,000.00 for loss of society and $500,000.00 for mental anguish to the mother of a deceased minor. The testimony at trial was that the mother had been admitted to a hospital for five months after the child's death and suffered from a severe depressive reaction. The trial court found that the award was not excessive. A jury awarded $180,000.00 in damages for mental anguish to a mother whose child was rendered a semicomatose quadreplegic after an automobile accident in *Apache Ready Mix Co., Inc. v. Creed*, 653 S.W.2d 79 (Tex.App.—San Antonio 1983, writ dism'd). This award was held not to be excessive.

In *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981), the jury awarded the plaintiff 2.516 million dollars for past and future damages. The plaintiff, a young boy, was severely burned, requiring skin grafts and debridement. He lost extremities and suffered extensive disfigurement. In *Lubbock Manufacturing Co. v. Perez*, 591 S.W.2d 907 (Tex.Civ.App.—Waco 1979, no writ) the jury awarded $1,905,000.00 to a child who was severely burned as a three month old baby when fire spread to the crib he was sleeping in as a result of an explosion. He suffered permanent disfigurement. In *International Harvester Co. v. Zavala*, 623 S.W.2d 699 (Tex.Civ.App.—Houston [1st Dist] 1981, writ ref'd n.r.e.) the jury awarded $605,000.00 to a man who suffered burns to his face, neck, arms, hands and back totally 42% of his body. He was treated daily with debridement, had skin grafts and was hospitalized for two and one half months. The jury awarded $492,493.00 to a twenty four year old man who sustained severe burns when gas vapor

exploded when he struck his welding torch in *Amoco Production Co., Inc. v. Thompson*, 657 S.W.2d 824 (Tex.App.—Corpus Christi 1983, rev'd 662 S.W.2d 951 (Tex. 1984). He was hospitalized for sixteen days, had significant burns on his face, and went through debridement. He had some permanent disfigurement and became addicted to drugs used to ease the pain.

In this case, we look to the case law as illustration only as we believe the better approach is to look at the facts and circumstances of this case, in determining whether or not the jury's award of damages to Devary Durrill and her parents is excessive. Devary Durrill was a single adult child of Mr. and Mrs. Durrill. She did not contribute anything toward the financial support of her parents nor was there anyone looking to her for such support. It is clear from the testimony that the jury's award to the Durrills was for non-pecuniary loss. This is true since there was no evidence that they had suffered or would suffer any pecuniary loss in the future on account of Devary's death. There was evidence presented that the Durrills were financially stable. Neither has consulted a mental health professional concerning their grief on any kind of a regular basis after Devary's death. At the suggestion of their attorney, each talked with a psychologist once as a couple and once apart. As to the damages sustained by Devary Durrill, they are necessarily limited to a large extent to the duration and effect of her pain and suffering. She lived but a short length of time, seven and one-half days. She had constant medical attention from very soon after the accident to the time of her death.

There must be some "high-water mark" to the amount awarded as full compensation to the parties in such a case. Justice demands as much. We find that the jury was motivated by other factors not found in the evidence on the question of these damages. The jury rendered a judgment which we find so excessive as to Mr. and Mrs. Durrill and to Devary Durrill as to shock our conscience. We have reached this conclusion after a review of the evi-

dence concerning the parents' non-pecuniary loss, and the injuries sustained by Devary Durrill. An award of more than two million dollars to each parent and two and a half million dollars to the Durrills as personal representatives of their daughter's estate exceeds that which is justifiable under the record. In our judgment, $300,000.00 would be a fair and reasonable compensation for Mr. Durrill and $300,000.00 for Mrs. Durrill. We find that the estate of Devary Durrill should receive $1,700,000.00 as full compensation for her injuries.

In appellant's forty-seventh through forty-ninth points of error, Ford complains of the excessiveness of the jury's award of $100,000,000.00 in exemplary damages and the excessiveness and lack of evidence to support the $20,000,000.00 award as remitted by the trial court. We will review the trial court's action on remittitur first, following the test set forth by the Supreme Court in *Flanigan v. Carswell*, 159 Tex. 598, 324 S.W.2d 835, 840 (1959) and *Alamo National Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981) and second, by TEX.R.CIV.P. 440. In *Alamo National Bank*, the Supreme Court, in a unanimous decision affirming the intermediate appellate court, held that the proper standards for reviewing an award of exemplary damages for excessiveness had been applied. We follow those standards.

■ Even when a trial court grants remittitur, we may decide that a further remittitur is warranted. *Adams v. Houston Lighting and Power Co.*, 158 Tex. 551, 314 S.W.2d 826 (1958); *Kregge Co. v. Prescott*, 435 S.W.2d 203 (Tex.Civ.App.—Texarkana 1968, writ ref'd n.r.e.); *Tex. and N.O. Ry. Co. v. Broadway*, 345 S.W.2d 814 (Tex. Civ.App.—Beaumont 1961, no writ). Factors to consider in determining whether an award of exemplary damages is reasonable include: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense

of justice and propriety. *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). Whether a jury verdict is excessive is a question of fact. *Id.; Southwestern Investment Co. v. Neeley*, 452 S.W.2d 705 (Tex.1970).

■ It has been said that the ratio between the actual damages and the exemplary damages should be reasonably proportional. However, the rule of reasonable proportionality does not, by itself, fix a particular ratio. This rule, taken in conjunction with the factors set forth in *Alamo National Bank*, determines what proportion is reasonable. *Tatum v. Preston Carter Co.*, 702 S.W.2d 186 (Tex.1986).

■ In the case at bar, the actual damages awarded were $6,861,663.00 and the exemplary damages were assessed by the jury at $100,000,000.00. The trial court let the jury verdict on actual damages stand but remitted the exemplary damages by $80,000,000.00. Our review of the record shows that the trial court's action in requiring a remittitur of the exemplary damage award was not manifestly unjust.

■ Ford also argues that the exemplary damage award as remitted remains excessive. We agree. In civil cases, we may require a party or his attorney to file a remittitur, if we are of the opinion that the verdict and judgment of the trial court is excessive. TEX.R.CIV.P. 440. Again, we should not disturb the findings on the ground of excessiveness if there is any probative evidence to sustain the award. We should not substitute our judgment for that of the jury unless we see a clear showing of passion, bias, and prejudice or that our review of the evidence leads us to the conclusion that it shocks our conscience. *Armellini Express Lines of Florida, Inc. v. Ansley*, 605 S.W.2d 297 at 313 (Tex.Civ.App.1980).

■ We have already found that there is evidence to support the gross negligence determination. Therefore, we must review the amount of the award to determine if the jury was clearly influenced by passion, bias and prejudice or that the amount is so

excessive that it shocks our conscience. The mere fact that the verdict is large is not conclusive that it was the result of passion, bias, prejudice or other considerations not found in the evidence. *Detar Hospital, Inc. v. Estrada,* 694 S.W.2d 359 (Tex.App.—Corpus Christi 1985, no writ); *Union Transports, Inc. v. Braun,* 318 S.W.2d 927 (Tex.Civ.App.—Eastland 1958, no writ). An award of $20,000,000.00 in exemplary damages is exceedingly large by any standards. Our review of the exemplary damage award in this case leads us to the conclusion that the exemplary damage award, even as remitted, remains excessive. We have considered Ford's conduct, the situation and sensibilities of both Ford and the Durrills, the degree of Ford's culpability and the extent to which Ford's conduct offends a public sense of justice and propriety. An exemplary damage award should reflect the facts and circumstances of the case itself and should not be a reflection upon the ability of the advocates to rouse the jury. The verdict, even as remitted by the trial court, still shocks our conscience. We find that the remitted award of $20,000,000.00 for exemplary damages is excessive in the amount of $10,-000,000.00. Appellant's forty-seventh through forty-ninth points of error are sustained.

■ In appellant's fiftieth point of error, Ford asks us to reverse and remand the case because the record indicates a degree of passion and prejudice sufficient to vitiate the verdict. We find that a remittitur of the actual and exemplary damage awards as we have suggested is sufficient. The excessiveness of the award as remitted does not mandate a blanket reversal of the case.

Ford urges in its fifty-first through fifty-third points of error that the burden of proof regarding gross negligence issues should be a "clear and convincing" standard rather than a "preponderance of the evidence" standard. Ford argues that society should be concerned that an innocent defendant will be wrongly punished by an improper award of exemplary damages. It argues that the "preponderance of evidence" standard is not appropriate when the interests of the parties are so unequal.

■ The general rule in civil cases is that a party having the burden of proof must establish its case by preponderance of the evidence. *State v. Turner,* 556 S.W.2d 563 (Tex.1977). Generally, the clear and convincing standard of proof has been used in those civil cases which present issues of constitutional proportions. *See In the Interest of G.M.,* 596 S.W.2d 846 (Tex.1980); *Addington v. State,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The standard has also been utilized in cases involving fraud or quasi-criminal actions. There, the burden is increased because the interests at stake may involve more than money, such as the defendant's reputation. Ford argues that the case at bar falls within this latter category. While Ford's argument has some validity as shown by its discussion of the law in several other jurisdictions which have adopted this standard, it is not applicable in Texas. We follow the Texas precedent established by the Courts of this State and hold that the burden of proof in cases involving gross negligence and exemplary damages is by a preponderance of the evidence. *See International Armament v. King,* 686 S.W.2d 595 (Tex. 1985); *Ford Motor Co. v. Nowak,* 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

Ford complains in its fifty-fourth and fifty-fifth points of error that the trial court should not have awarded exemplary damages in this case because Ford has already been punished for actions based upon the same course of conduct as this case. Ford points to the cases of *Grimshaw v. Ford Motor Co.,* 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981) in which a California jury awarded $125,000,000.00 which was remitted to $3,500,000.00 in exemplary damages for a defective Pinto; and *Ford Motor Co. v. Stubblefield,* 171 Ga.App. 331, 319 S.E.2d 470 (1984) in which a Georgia appellate court upheld an $8,000,000.00 exemplary damage award in a suit involving a 1975 Mustang II.

The purpose of awarding exemplary or punitive damages is multi-faceted. In *Hofer v. Lavender* 679 S.W.2d 470, 474 (Tex.1984), the Supreme Court discussed historically the purposes of exemplary damages. The most compelling reasons for awarding exemplary damages are punishment and deterrence. In *Hofer*, the Court discusses early Texas case law in which exemplary damages were awarded as reimbursement for losses too remote to be considered as elements of strict compensation and to compensate for such things as inconvenience and attorney's fees. In the face of a vigorous dissent, the majority held that Texas Courts look at both the wrongdoer and the aggrieved individual in considering an award of exemplary damages. The award of exemplary damages integrates punishment, deterrence and those elusive factors affecting the aggrieved party. Given the theory of gross negligence which Texas follows, we will not disallow the exemplary damage award based upon Ford's argument that it has been punished enough.

Ford's fifty-sixth point of error asserts that a judgment for exemplary damages contravenes art. 16 § 26 of the Texas Constitution. In *Hofer v. Lavender* 679 S.W.2d 470 (Tex.1984), the Supreme Court held that a decedent's cause of action survived her death under TEX.REV.CIV. STAT.ANN. art. 5525 and could be prosecuted by her parents, heirs and representatives. Ford argues that this decision is wrong. In this instance, we follow the precedent set forth in *Hofer* and reject Ford's argument.

Appellees' first and second cross-points allege error by the trial court in requiring a remittitur of the exemplary damages. We have previously addressed appellees' arguments and overrule these cross-points. In their final cross-point, the Durrills alleged error by the trial court's failure to award prejudgment interest on their entire recovery from the date of the verdict until the final judgment was signed. In *Canvar v. Quality Control Parking, Inc.*, 696 S.W.2d at 554, the Supreme Court held that, as a matter of law, a prevailing plaintiff may recover prejudgment interest on damages that have accrued by the time of judgment. The Court specifically held that prejudgment interest should not be awarded on punitive damages. *Id.* at 555. In *Cavnar*, the Court did not allow prejudgment interest on the wrongful death claim because the Cavnar children did not segregate their accrued damages from their future damages. In this case, the Durrills also failed to segregate their accrued damages from their future damages.

If the Durrills' failure to plead prejudgment interest is not fatal to their claim for prejudgment interest, it is clear that they may recover prejudgment interest only upon the damages awarded as survival damages. The long standing rule in Texas has been that a judgment must be supported by the pleadings. *Stoner v. Thompson*, 578 S.W.2d 679 (1979); *Starr v. Ferguson*, 140 Tex. 80, 166 S.W.2d 130 (Tex.Comm'n App. 1942, opinion adopted) TEX.R.CIV.P. 301 says, in part: "The judgment of the court shall conform to the pleadings ...." The Supreme Court has not dispensed with the requirement that pleadings must be on file to support prejudgment interest even in cases where prejudgment interest is recoverable as a matter of right. *Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80 (Tex.1976). We are thus faced with the decision of whether *Cavnar* sought to dispense with the requirement of pleading prejudgment interest for those cases which are still in the judicial process but do not contain pleadings for prejudgment interest because at the time they were filed and tried, Texas law did not allow such recovery. We do not read *Cavnar* as intending to erode the basic principle that a plaintiff must recover upon the facts set forth in the pleadings and that the judgment of the court should conform to the pleadings. Plaintiffs' third cross-point is overruled.

The judgment of the trial court will be reformed and affirmed in the total amount of $12,311,633.07 with interest at 10.92% from July 19, 1984, until paid if, within

fifteen days from this date, appellees file a remittitur of $14,550,000.00. If this remittitur is not timely filed, the case will be reversed and remanded for a new trial.