**FEDERAL PACIFIC ELECTRIC COMPANY, Appellant,**

v.

**David Bruce WOODEND and Wayne Henry Hooper, Appellees.**

No. 2–85–164–CV.

Court of Appeals of Texas, Fort Worth.

July 1, 1987.

Rehearing Denied Sept. 10, 1987.

Mayor, Day & Caldwell and Roger A. Rider, Houston, for appellant.

McGuire & Levy and Lonnie C. McGuire, Jr., Irving, for appellees.

Before FENDER, C.J., and FARRIS and LATTIMORE, JJ.

## OPINION

HOWARD M. FENDER, Chief Justice.

This is a products liability/negligence/implied warranty case arising out of an electrical explosion at Six Flags Mall in Arlington, Texas. Based upon jury answers to several special issues on three different theories, the trial court rendered judgment in favor of the plaintiffs in excess of $700,000. Appellant, Federal Pacific Electric Company (Federal Pacific or appellant herein), appeals the verdict, denial of a motion for judgment N.O.V. and denial of a motion for new trial in ten points of error. Appellees bring one cross-point seeking prejudgment interest.

We affirm.

Because the sufficiency of the evidence to support the jury's findings has been challenged, we must review the facts of this complex and technical case. Six Flags Mall was opened in 1969. The electrical components in question were manufactured and assembled by appellant. On Friday, October 23, 1979, appellee, David Woodend (Woodend or appellee Woodend herein), and Kenneth Morris (Morris herein), employees of Slocum Electric, arrived at the mall in response to a service call. Brooks Fashion, one of the tenants, was experiencing dim and blinking lights. Morris was the senior electrician of the two and was in charge of the service call.

After speaking with the Brooks manager and Clint Carroll, the mall manager, Morris and Woodend were given access to the outside room containing the electrical distribution panel servicing Brooks. The electricians concluded the lighting problem was caused by a defective phase in the three phase QMQB switch manufactured by appellant. (See Drawing #1 attached hereto [copied from appellant's brief and included not as evidence but solely to aid the reader].) They did not have a replacement switch with them and promised to return with one the next day.

On Saturday morning, Woodend returned to the mall with appellee Wayne Hooper (Hooper or appellee Hooper herein) as his helper but without Morris. Richard Webb, Woodend's boss, testified Woodend volunteered to replace the switch on Saturday without Morris' supervision. Although Woodend had worked service calls for Slocum Electric for two months prior to the explosion, he had never worked on switching gear. He had worked on switching gear while serving aboard a U.S. Coast Guard vessel but had never seen equipment of the type installed at Six Flags Mall.

The switching gear appellees were attempting to repair was located in an equipment room behind the mall itself. Although appellees cut off the power flowing out of the switch to Brooks, power was still coming into the switch unit and the switch was "energized" or "live." "Load Side" designates the line going out to the

user (Brooks). "Line Side" refers to the wiring coming into the switch from the transformer. Woodend testified that, to his knowledge, there was no way to cut power to the line side of the switch except by calling the power company to come out and disconnect one of its transformers. That would have cut power to many stores in the mall, not just Brooks.

The actual switching gear was mounted against one wall of the equipment room. Each store had its own switch housed in a rectangular metal box-like unit. These boxes or "cans" were stacked one on top of another. Inside each box were three large horizontal fuses. Appellees believed that a contact in one of the Brooks fuses was defective. Power from the electric company was transformed down into 480 volts before being fed into the switches by means of three vertical "buss bars." The "buss bars" in question were two inches wide by one quarter inch thick. The power lines were attached to the top of the buss bars, thus energizing the bars. Each switch is bolted onto each buss bar, making contact in one spot on each of the three bars. (See Drawing #1.) The top phase of a switch was connected to the far left buss bar. This was known as the "A phase." The "B phase" was bolted to the middle buss bar, while the "C phase" was bolted to the far right buss bar. Each buss bar had threaded holes drilled down the center. The A phase then ran horizontally over to the right side of the switch where the right end of the buss strap was bolted to the switch. The B strap was, of course, shorter and the C strap was shortest of all. The can does not touch the buss bars themselves. The can only touches the buss straps on the right end of the buss straps. (Points $A_3$, $B_3$ and $C_3$ on Drawing #1.) There was some dispute as to whether these buss straps and bars were pure aluminum or an aluminum alloy. The buss bars are mounted on a framework against one wall reaching almost from floor to ceiling. Because electricity flows into each bar, all three are energized. The wiring coming out of the right side of each can then leads to the particular store. Each

switch has three large fuses, usually of 100 or 200 amps each.

The left end of the buss strap, bent at each end, is bolted to the left buss bar. (Points $A_5$, $B_5$ and $C_5$ on Drawing #1.) At the far left end of the buss strap is a detent or boss stamped into the strap. Ideally, when the strap is screwed down properly against the buss bar, the boss protrudes beyond the left side of the buss bar, parallel to the side of the buss bar. This detent rests against the side of the vertical buss bar and prevents the horizontal strap from rotating clockwise.

The buss strap is bent outward away from the surface of the buss bar, but still parallel to the face of the buss bar. At the far right end of the strap, it has two more 90 degree bends that raise the right end even further from the buss bar, while leaving the strap parallel to the buss bar. There is another hole in the right end of the strap. It is by means of a screw there that the buss strap is bolted to the copper lugs on the right side of the switch. It was disputed whether the straps were to be mounted parallel to each other and whether they were to be mounted one or two holes apart on the buss bars.

It was Woodend's intention to unbolt and disconnect the Brooks can, pull it away from the buss bars, and install the new can he had picked up from appellant. The buss straps must be disconnected from contact with the can on the right end of the straps, while remaining attached to the buss bars by their left hand screws. Woodend unscrewed the A phase and B phase screws. (Screws $A$, and $B$, on Drawing #1.) Hooper was kneeling down behind Woodend taking the new switch out of the box. Woodend recalls removing the B phase lug screw and setting the screw down. He reached into the can to remove the C phase screw when the explosion occurred. (Screw $C$, on Drawing #1.) Both men were burned by the hot gases formed by melted and vaporized metal parts, Woodend much more so than Hooper. The two men managed to get outside the door to a parking lot area where mall employees quickly came to their aid and summoned help. Ex-

actly what caused the explosion was strongly disputed by the parties and lies at the heart of this case.

At the risk of over simplifying a highly complex matter, we will attempt to reduce the opposing theories to simple terms. Appellees, who were plaintiffs below, contend that the energized A phase buss strap rotated down in a clockwise motion until it touched the energized B phase strap, causing a "phase to phase" arc or short since electricity was still flowing through the buss bars and straps. Appellant denies this occurred and instead argues the evidence suggests a "phase to ground" short, most likely caused by Woodend touching an energized portion of the can such as the C phase screw with his screwdriver, while touching a grounded portion of the can— such as the hasp or the side of the can. (Hasp is point D on Drawing # 1.) Appellant contends Woodend caused such a short by dropping the screwdriver or otherwise losing his grasp of it.

Of course the switching unit was badly damaged by the intense heat. The remains of the Brooks can, the can directly above the Brooks can and the can directly below the Brooks can were shown to the jury. Both sides also used models and mock-ups to demonstrate their theories to the jury. We have many of the original exhibits before us and have benefited greatly from being able to examine them while reviewing the lengthy and complex testimony. Unfortunately, for both parties, large portions of their expert testimony was incoherent and meaningless not through any fault of the court reporter but because of imprecise word usage by the attorneys and witnesses. Exhibits were referred to as "this piece here" or "that one" rather than by name or exhibit number. The effects of electrical current, arcing, high temperature and other such subjects were similarly explained in vague references such as:

Q. See this place right here and this place right down here?

A. Yes.

Q. Wouldn't you agree that something has been broke off of there?

. . . .

or:

Q. Could you do it down below here just as well?

A. Oh, I could do it on these two buss bars and do the same thing. Do it together on these, and so forth. And if I do it over here, like this, and this, of course, touching that, just what I did before where I could light that light. Put it on here.

Q. That's just a phase to ground?

A. That's a phase to ground.

We recognize that at trial attorneys are primarily occupied with persuading the trier of fact. However, it is also essential that attorneys preserve the testimony of their witness in the event of appellate review. Counsel must recognize when their witnesses are giving *non-verbal* testimony through gestures or vague references to maps, charts, diagrams and physical objects. Crucial testimony may be rendered meaningless to an appellate court, and may result in reversal. *See, e.g., Mathews v. Thornell*, 236 S.W.2d 251 (Tex.Civ.App.— San Antonio 1951, no writ).[1]

Appellant asserts in its first point of error that the trial court erred in admitting into evidence Plaintiff's Exhibit No. 1 because such exhibit contained post-manufacture design changes in violation of TEX.R. EVID. 407. Plaintiff's Exhibit No. 1 (P. Ex–1 herein) was a fused switch manufactured by appellant and similar to the Brooks switch at issue. The exhibit was of a much later design, however, and differed from the Brooks switch in three material ways: 1) it contains a warning not to work on the switch without de-energizing it; 2) it has barriers between the phases of a non-conducting material; and 3) it has a phenolic block on the back of the switch that acts as an additional phase barrier. This switch design did not exist when Six Flags Mall was built.

---

**1.** For an excellent article aimed at keeping such unfortunate events from occuring, *see* Pope and Hampton, *Presenting and Excluding Evidence,* 9 TEX.TECH L.REV. 403 (1978). *See also,* Jordan, *Texas Trial Handbook,* at 21–22 (2d ed. 1981).

The attorneys represented to the court that P. Ex-1 became available in 1979 or 1980. Appellant argues that P. Ex-1 is not admissible because the appellees pled negligent design. Appellees responded that they pled defective design and defective manufacture, thus making the exhibit admissible under TEX.R.EVID. 407. Neither side is correct.

■ Rule 407 concerns "Subsequent Remedial Measures." Under the rule, evidence of measures taken subsequent to the event which, "if taken previously, would have made the event less likely to occur ..." is not admissible. The rule does not *prevent* admissibility of such evidence in products liability cases based on strict liability. Nor, however, does the rule automatically render such evidence admissible. Other rules of evidence may apply to bar the admission of such evidence. Appellees did plead defective manufacture. We have carefully examined their pleadings and find *no* pleading of defective design. Nevertheless, the defective manufacture pleading was sufficient to make this case a products liability case, at least in part. Of course, evidence of subsequent design changes was not admissible to prove the negligence of the appellant. The trial court so instructed the jury when P. Ex-1 was admitted, and again in the charge to the jury at the submission of the case.

■ Appellant argues that rule 407 only applies to design defect. It cites no authority for such a narrow construction of the rule, and we have found none. Appellant's first point of error is overruled.

Appellant complains in its ninth point of error about the form of special issue number one in that it was not supported by the pleadings. Appellant argues that since appellees only plead defective manufacture, the issue should have been submitted in a narrow fashion, rather than in a general manner.

■ The State Bar of Texas, *Texas Pattern Jury Charges*, Vol. 3 (1982), contains sample special issues on various products liability issues. The sample broad-form issue for multiple manufacturing defects is identical to the one for single manufacturing defects. *Pattern Jury Charges* (PJC) 71.01A; 71.01F. Although the appellant properly requested a form of the issue that conformed to the appellees' pleadings, the trial court has broad discretion in how the issues shall be submitted. *Ford Motor Co. v. Durrill*, 714 S.W.2d 329, 334 (Tex.App.— Corpus Christi 1986, no writ); TEX.R. CIV.P. 277. Point of error nine is overruled.

In its eighth point of error, appellant contends the trial court erred in overruling its motion for judgment N.O.V. because the switch and panel board were not in the same condition at the time of the explosion as they were when they left the hands of the appellant. Because the $A_1$ and $B_1$ screws (Diagram #1) had been removed prior to the occurrence, appellant argues the appellees had altered the switch in a manner not foreseen by appellant. Working on the switch while energized was never intended by the appellant. Appellant argues that appellees had the burden of pleading and proving by preponderance of the evidence that Federal Pacific designed the equipment knowing or expecting it would be disassembled while energized.

According to *PJC*, 70.05, when the elements of substantial change or alteration are raised by the evidence, an instruction on such should be submitted following the definition of "unreasonably dangerous." *See Caterpillar Tractor Co. v. Gonzales*, 599 S.W.2d 633, 636–37 (Tex.Civ.App.—El Paso 1980, writ ref'd n.r.e.).

■ Appellant contends *Colvin v. Red Steel Co.*, 682 S.W.2d 243, 246 (Tex.1984) holds that an essential element of the product liability plaintiff's cause of action is a finding that the product was not fit for its intended or reasonable foreseeable use at the time it left the manufacturer. *Colvin* was an instructed verdict case, and while we agree with the legal theories involved, we do not construe it to hold that when a products liability case goes to the jury there must be an issue worded according to such ruling from *Colvin*, rather than being part of a definition or instruction. Appellant failed to request the altered condition

definition or any similar definition. Failure to object and tender the instruction in correct form waives any such error. *Terminix Intern., Inc. v. Lucci,* 670 S.W.2d 657, 661 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); *Texas General Indem. Co. v. Moreno,* 638 S.W.2d 908, 914 (Tex.App.—Houston [1st Dist.] 1982, no writ). Point of error eight is overruled.

In its second, third and fourth points of error, appellant contends there was no evidence to support special issues 1A, 1B, 2A, 2B, 3B, 3C, 3E and 3F. Appellant alternatively argues in points of error five, six and seven that the evidence is insufficient to support these same issues.

In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *See Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985); *International Armament Corp. v. King,* 686 S.W.2d 595, 597 (Tex. 1985); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *In re King's Estate,* 244 S.W.2d at 661–62.

A "no evidence" point of error must and may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Commonwealth Lloyd's Ins. Co. v. Thomas,* 678 S.W.2d 278, 288 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEXAS L.REV. 361 (1960).

An assertion that the evidence is "insufficient" to support a finding of fact can mean that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the finding should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965). We are required to consider all of the evidence in the case in making this determination. *See id.* We shall address the "no evidence" points first.

Appellant contends the trial court erred in overruling its motion for judgment N.O.V. because there was no evidence to support special issues 1A and 1B, that the fused switch and panel board in question was in a defective condition at the time it left the care, custody and control of Federal Pacific Electric Company and that such defective condition was a producing cause of the occurrence in question.

■ We find there was some evidence to support submission of special issues 1A and 1B. Appellee Woodend testified he did not drop the screwdriver and short the system. The appellees relied on expert testimony from Dr. Charles Smith, an electrical engineering professor and Dr. Ray Claxton, a metallurgical and mechanical engineer. These experts examined the remains of the equipment then expressed their opinions as to the cause of the explosion.

Dr. Claxton testified that he examined the screwdriver appellee Woodend used on the day in question. He identified lumps of copper, aluminum and iron which solidified on the shank of the screwdriver. Dr. Claxton testified that the screwdriver would have to be cooler than the molten metal for the deposits to occur. From this he concluded the screwdriver, although in contact with the cloud of molten and gaseous metal during the explosion, was *not* directly in the arc. Dr. Smith agreed with this conclusion. Additionally, Dr. Claxton testified that each of the nine buss straps involved in the fire left clean horizontal stripes on the buss bars because the straps were bolted against the buss bars and the black smoke coated all available surfaces of the buss bars except where the buss straps protected the bars. The position occupied by the A phase buss strap in the Brooks switch was not as "clean" as the other eight positions, as if that particular strap had not been tightly fastened and allowed

smoke to get between the back of the buss strap and the front of the buss bar. (Position A₅ on Drawing # 1).

Plaintiffs' Exhibit 28A was identified as one of the longer A phase straps involved in the explosion. The lower inside corner of the boss is damaged as if the strap had been pulled upward in a counter-clockwise fashion. This is consistent with appellees' theory that the strap was assembled in the wrong position and was forced up to fit properly.

Dr. Smith testified from an electrical standpoint that the molten copper that was deposited on the shank of the screwdriver could not have been there if the screwdriver was carrying a large electrical current as appellant contended it was. Additionally, he stated that if the screwdriver were the source of the electrical arc, it would have vaporized in five to ten milliseconds, which it obviously did not do since we have the actual screwdriver as an exhibit. Observing all three damaged A phase connectors from a side view, Dr. Smith noticed that Plaintiffs Exhibit 28A is bent upward in a manner very different from the other two straps. This also is some evidence that the Brooks A phase strap was installed in the wrong position and was forcibly yanked and twisted so that the A₃ bolt hole would match the A₂ bolt hole. Removal of the A₁ bolt, he testified, freed the A strap and it slipped down against the B phase strap causing the arc. Point of error two is overruled.

■ In its fifth point of error, appellant contends the trial court erred in denying its motion for new trial because there was insufficient evidence to support the jury's answer to special issues 1A and 1B, the strict liability issues. Under the standard of review for insufficient evidence, we must consider all of the evidence, not just that which supports the verdict as in "no evidence" cases. *Garza*, 395 S.W.2d at 823.

The very nature of this lawsuit made it dependent upon expert testimony and circumstantial evidence. No one could actually *see* whether the A phase buss strap was rotating downward or not since it was be-

hind the fused switch mechanism. The electrical arc occurred in an extremely brief period of time, lasting at the most one and one-half seconds according to one of appellant's witnesses. During that time, extremely high temperatures in excess of 10,000 degrees Fahrenheit were generated, resulting in the vaporization of portions of the buss bars, copper connector straps, bolts and the walls of the can itself. This damage extended to the can above and the can below the Brooks switch. There was considerable disagreement between the experts of each side as to what the remaining physical evidence indicated as to the cause, origin point and path of the destruction although the witnesses did agree on many common principles of physics, metallurgy and electricity.

Appellee Woodend testified that he did not cause a short by dropping his screwdriver. On cross-examination, appellant's attorney asked Woodend if, immediately after the explosion, he told appellee Hooper "I am sorry. I dropped the screwdriver." Woodend replied, "I believe I said I dropped the screwdriver, yes." Appellee Hooper had his back partially turned and was looking down at the new switch when the explosion occurred, so he did not see what happened. Hooper testified that he and Woodend, both badly burned, talked about what caused the explosion as they waited for the ambulance. It was Hooper's recollection that they were both puzzled by the event, and Woodend stated that if he did anything to cause it, he was sorry. Hooper did not remember Woodend specifically stating that he had dropped the screwdriver. On cross-examination, appellant's attorney had Hooper read from his deposition that Woodend said at the scene that "he was sorry, that he thought that he had dropped the screwdriver in it, maybe, but he said he—you know, he didn't know. He was really dumfounded by it, in my opinion."

Appellees' experts Drs. Smith and Claxton explained extensively to the jury their methods for reaching their opinions as to the cause of the explosion. The jury heard detailed testimony concerning microscopic

examinations of the physical evidence, analysis of the melted particles, discussions on burn patterns left by electric arcs and other such topics.

Appellant presented its experts including Gardner Barnstead, a representative of Federal Pacific, who was involved in the design of the new switching equipment developed in the mid to late 1970's. Barnstead testified concerning the purpose and function of Federal Pacific's equipment as well as the reasons behind the 1975 design change. He and appellant's other experts, Charles Titus and Jack Green, also explained to the jury electrical theory, the properties of electrical arcs, metal "cold flow" and the type of destruction ordinarily caused by the phase faults and phase to ground faults.

■ The jury found itself faced with a formidable task to weigh and sift all the testimony presented to them orally and by demonstrations during the trial. Of course the jury, as the trier of fact, was free to believe or disbelieve the testimony presented by the witnesses. Additionally, the jury is to resolve inconsistencies or contradictions in the testimony and to judge the credibility of the witnesses. *Fichtner v. Richardson,* 708 S.W.2d 479, 483 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Hebert v. Pan American Van Lines, Inc.,* 681 S.W.2d 221, 222 (Tex.App.—Houston [14th Dist.] 1984, no writ). Opinion testimony does not establish material facts as a matter of law. *See Blackmon v. Piggly Wiggly Corporation,* 485 S.W.2d 381, 384 (Tex. Civ.App.—Waco 1972, writ ref'd n.r.e.). After considering and weighing all the evidence which is before us in this case, we cannot say the verdict reached by the jury is supported by insufficient evidence. As Justice Robertson pointed out in his concurring opinion in *Dyson v. Olin Corp.,* 692 S.W.2d 456, 458 (Tex.1985) (Robertson, J., concurring), this court is "not free to reweigh the evidence and set aside a jury verdict merely because the judges feel that a different result is more reasonable." *Id.* Point of error five is overruled.

In its tenth point of error, appellant contends the jury's answer to special issue no.

7 was against the great weight and preponderance of the evidence. In answer to special issue no. 7, the jury attributed sixty percent (60%) of the causation of the explosion and fire to the product or negligence of appellant, and forty percent (40%) to the negligence of appellee Woodend. Appellant argues that because the jury found Woodend negligent in working on the switch without de-energizing it and Plaintiffs' witness Dr. Smith stated 999 times out of 1,000 the cause of such an electrical explosion is negligently sticking a screwdriver into the switch, the jury verdict is obviously one of sympathy and bias and is not supported by the evidence.

In reviewing a point of error asserting that a finding is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam); *Ford Motor Co. v. Nowak,* 638 S.W.2d 582, 585 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). So considering the evidence, if a jury finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959) (per curiam); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam).

■ This issue involves much of the same evidence discussed above. It is true the appellees could not have been injured had the power coming into the switch from the line side been turned off. There was also evidence, however, that had the fused switch and board been properly constructed, appellees could have successfully replaced the live switch without injury. Several witnesses testified that the usual and accepted manner of replacing such a switch was to do it exactly as Woodend did it—live. Dr. Smith did testify that 999 times out of a 1,000 the electrician causes the fault with a screwdriver. This was during

the course of his explanation of why the physical condition of the screwdriver itself indicated it was *not* the cause of the short. The jury having made its determination of the causation of the plaintiffs' injuries, we cannot say under the facts before us that the jury's finding is so against the great weight and preponderance of the evidence that the result is manifestly unjust. *See Farley v. MM Cattle Company*, 529 S.W.2d 751, 756 (Tex.1975). Appellant's tenth point of error is overruled.

■■■ Because the verdict of the jury can be supported on any one of the three theories appellees presented to the jury—strict liability, breach of implied warranty and negligence—our rulings on the sufficiency of the evidence to support special issues 1A and 1B obviate the necessity of addressing appellant's points of error attacking appellees' other two theories. *See McAllen State Bank v. Linbeck Const. Corp.*, 695 S.W.2d 10, 21 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.).

Appellees raise one cross-point of error, contending they are entitled to prejudgment interest on damages accrued by the time of judgment. At trial, appellees pled for:

> [J]udgment against the Defendants for their damages as herein alleged; that interest at the legal rate of nine percent (9%) compounded annually be awarded to Plaintiffs; that Plaintiffs recover their costs of suit in this behalf incurred, and that they have such other and further relief, general or special, at law or in equity, to which they may be justly entitled.

The trial court granted judgment for appellees on April 12, 1985, "with interest there-on from date at the rate of ten (10%) percent per annum until paid." Prejudgment interest as an element of the plaintiff's cause of action in a personal injury suit was first awarded in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985). The court stated that its ruling applied to cases still in the judicial process. *Id.* at 556. *Cavnar* did not, however, dispense with the requirement that a plaintiff seeking prejudgment interest as a common-law element of damages plead for such. *See Benavides v. Isles Const. Co.*, 726 S.W.2d 23 (Tex.1987); *Rep. Nat. Bank v. Northwest Nat. Bank*, 578 S.W.2d 109 (Tex.1978); *Bilderback v. Priestley*, 709 S.W.2d 736, 743–44 (Tex.App.—San Antonio 1986, writ ref. n.r.e.) (opinion on reh'g).

■■■ A pleading for interest generally is a prayer for post-judgment interest, especially where, as here, the plaintiff asks that the interest be compounded annually. *See DeSoto v. Matthews*, 714 S.W.2d 133, 135 (Tex.App.—Houston [1st Dist.] 1986) *writ ref'd n.r.e.*, 721 S.W.2d 286 (Tex.1986) (*per curiam*). Pre-judgment interest is compounded daily, not annually. *Cavnar*, 696 S.W.2d at 554. A prayer for general relief is also not sufficient to support prejudgment interest. *Vidor Walgreen Pharmacy v. Fisher*, 728 S.W.2d 353 (1987). In the absence of pleadings, a post-verdict trial amendment or other method of raising the issue before the trial court, we may not award pre-judgment interest where the issue is raised for the first time in this court. *See Allright, Inc. v. Pearson*, 735 S.W.2d 240 (1987); *Bilderback*, 709 S.W.2d at 743. Appellees' cross-point of error is overruled.

The judgment is affirmed.